## PEPPER *v.* LITTON.

No. 39.  Argued November 9, 10, 1939.—Decided December 4, 1939.

*Mr. M. M. Heuser,* with whom *Mr. Geo. M. Warren* was on the brief, for petitioner.

*Mr. Henry Roberts* for respondent.

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

The case presents the question of the power of the bankruptcy court to disallow either as a secured or as a general or unsecured claim a judgment obtained by the dominant and controlling stockholder of the bankrupt corporation on alleged salary claims. The judgment of the District Court disallowing the claim was reversed by the Circuit Court of Appeals (100 F. 2d 830). We granted certiorari because of an apparent restriction imposed by that decision on the power of the bankruptcy court to disallow or to subordinate such claims in exercise of its broad equitable powers.

The findings of the District Court, amply supported by the evidence, reveal a scheme to defraud creditors reminiscent of some of the evils with which 13 Eliz. c. 5 was designed to cope. But for the use of a so-called

"one-man" or family corporation, Dixie Splint Coal Company, of which respondent was the dominant and controlling stockholder, that scheme followed an ancient pattern.

In 1931 Pepper, the petitioner, brought suit in a state court in Virginia against Dixie Splint Coal Company and Litton, the respondent, for an accounting of royalties due Pepper under a lease.[1] While this suit was pending and in anticipation that Pepper would recover, Litton caused Dixie Splint Coal Company to confess a judgment in Litton's favor in the amount of $33,468.89, representing alleged accumulated salary claims dating back at least five years. This was done by P. H. Smith, secretary and treasurer of Dixie Splint Coal Company, who, according to the District Court, was "an employee of Litton and subservient to the latter's will." This was on June 2, 1933. Execution was issued on this judgment the same day but no return was made thereon, Litton waiting "quietly until the outcome of the Pepper suit was definitely known." On February 19, 1934, Pepper obtained a judgment against Dixie Splint Coal Company for $9,000. On motion of the company, execution on the judgment was suspended for ninety days to permit an appeal. But defendant in that suit did not appeal.[2] Instead, on March 19, 1934, while execution on the Pepper judgment was suspended, Litton caused an execution to issue on his confessed judgment and levy to be made thereunder. Yet Litton "had no intention of trying to satisfy his confessed judgment" against his corporation "unless and until it became necessary to do so"; he was using it "only as a shield against the Pepper debt." Thus, when execution and levy were made March 19, 1934, no steps were

[1] During this litigation A. P. Pepper, the plaintiff, died and the suit was continued in the name of Jean McNeil Pepper, as his executrix.

[2] Plaintiff, however, did appeal on certain phases of the case. See *Pepper* v. *Dixie Splint Coal Co.*, 165 Va. 179; 181 S. E. 406.

taken for over two months towards a sale of the property on which levy had been made. On May 31, 1934, Pepper caused an execution to issue on her judgment, and levy was made June 2, 1934. On this latter date the sheriff "who seems to have been cooperating with Litton" advertised the property for sale under the Litton levy made in the previous March. On June 14, 1934, the sale was held and Litton became the purchaser of the property sold at the sum of $3,200.

The next step in the "planned and fraudulent scheme" was the formation by Litton of "another of his one-man corporations," Dixie Beaver Coal Company, to which Litton transferred the property he had acquired at the execution sale at a valuation of $20,135.36 to be paid for in stock of the new company.[3]

On September 4, 1934, the third step in Litton's scheme was taken. On that date Dixie Splint Coal Company, pursuant to a resolution of the board of directors, passed June 16, 1934, (two days after the Litton execution sale) filed a voluntary petition in bankruptcy. This step, according to the findings below was "plainly for the sole purpose of avoiding payment of the Pepper debt." The bankrupt at that time had $4,500 on bank deposit and $12,000 in accounts receivable, most of which was good. The cash on deposit was then more than sufficient to pay all creditors with the exception of Pepper. And Litton caused the voluntary petition to be filed "feeling confident that his confessed judgment would cover and consume" the remaining assets. Adjudication followed on September 7, 1934.

---

[3] The resolution of the board of directors of this new company certified that in their opinion the property "formerly owned by Dixie Splint Coal Company and now owned by Scott Litton is worth $20,135.36 in current money of the United States and we fix the value of the same at this sum, which is to be paid for in stock."

Litton's next step in his scheme to defeat the Pepper claim was to purchase wage claims against the bankrupt and to cause "in some manner" other claims to be withdrawn. This was done, according to the District Court, so that Pepper might be made to appear as the only general creditor—a situation designed to give Litton a decided technical advantage, as we shall see.

On June 13, 1934, Pepper had instituted suit in the Virginia state court to have the Litton judgment declared void. On June 15, 1934, the day following the sale under the Litton execution, the sheriff instituted an interpleader action joining Litton, Pepper and the Clinchfield Coal Corporation and alleging, *inter alia*, that that corporation had a prior lien on all the property sold for a debt of $2,153. Litton and Pepper both answered admitting the prior lien of the corporation, Pepper answering "without prejudice to her rights" asserted in the chancery cause to have the Litton judgment set aside. On July 18, 1934, an order in the interpleader suit was entered directing payment of $2,153.00 to the Clinchfield Coal Corporation.

Thereafter the trustee, with the authority of the bankruptcy court, moved in the state court to set aside the judgment and to quash the execution thereof on the ground that the judgment was void since it had not been confessed in the manner required by the Virginia statute.[4]

---

[4] At the first meeting of creditors held on September 26, 1934, the strategic position of Litton was further improved by two other events which later the District Court quite properly denounced. In the first place, P. H. Smith, secretary and treasurer of Dixie Splint Coal Company and the one who had caused the entry of the Litton judgment on June 2, 1933, by confession against the company, was elected trustee. In the second place, Smith was authorized to employ, and did in fact employ, as attorney for the trustee, one I. M. Quillen. Quillen, or his firm, was attorney for Dixie Splint Coal Company. As such he or his firm had prepared and filed the petition in bankruptcy for the com-

The court concluded that the Litton judgment was void but denied the motion on the grounds that the trustee was estopped to challenge it. The court held that Pepper in the interpleader suit had treated the fund derived from the execution sale under the Litton judgment as valid and consequently had elected to recognize the validity of the judgment. Since Litton had acquired, or caused to have withdrawn, all the remaining claims against the

---

pany. And he appeared at the first meeting of creditors as counsel for the bankrupt and yet at that time, as attorney for Litton, filed the claim of Litton for $33,468.89 as a preferred or secured claim. And at the time these appointments were made the controversy between Pepper and Litton over the latter's judgment was known and recognized, although formal proof of the Pepper claim was not filed until November 8, 1934. The grave impropriety of these appointments became striking as administration of the estate was commenced.

On October 6, 1934, Pepper moved in her state court action to quash all execution issued and outstanding on the Litton judgment. Quillen, attorney for the bankruptcy trustee, appeared in opposition to the motion, acting as attorney for Litton, and contended that the intervention of bankruptcy had deprived the state court of jurisdiction. The state court reserved decision. On October 15, 1934, Pepper petitioned the referee to direct the trustee to contest the Litton judgment in the state court proceeding. Quillen, stating that he acted as attorney for Litton, opposed the petition. After some delay, new counsel for the trustee were obtained who soon asked the court for authority to institute a new and independent suit in the state court to have the Litton judgment declared void. This authority was granted.

The District Court, though condemning such steps, stated it did not suggest that Smith and Quillen were acting "with any fraudulent plan or intention of utilizing their positions in aid of Litton and to the detriment of the estate." Yet he denounced the impropriety of such conduct and emphasized the incompatible and conflicting positions which these persons occupied. On the professional ethics of the conduct of Quillen, the District Court aptly observed: "It is generally accepted that an attorney for the bankrupt should not be chosen attorney for the trustee in any case. And it is even more evident that an attorney who represents a creditor whose claim is under attack should not be chosen as attorney for the trustee who, on behalf of other creditors, is charged with the duty of making that attack."

estate, the trustee in this suit was representing only Pepper. Therefore, since Pepper was estopped, so was the trustee. On appeal that judgment was affirmed on those grounds. *Smith* v. *Litton,* 167 Va. 263; 188 S. E. 214.

Thereafter the question of the allowance of the Litton judgment came before the bankruptcy court on exceptions previously made by Pepper. That court concluded that the decision by the state court that the trustee was estopped to attack the Litton judgment there, did not prevent the bankruptcy court from considering its validity. It therefore reviewed all the facts and concluded (1) that Litton and the Dixie Splint Coal Company had made a "deliberate and carefully planned attempt" to avoid "the payment of a just debt"; (2) that Litton and the Dixie Splint Coal Company were "in reality the same"; and (3) that the alleged salary claims underlying the Litton judgment did not represent an "honest debt" of the bankrupt corporation, being merely bookkeeping entries for the double purpose of lessening income taxes and of enabling Litton to appear as a creditor of the corporation in case it became financially involved.[5] Accordingly, the

---

[5] This conclusion was based on the history and nature of the claims for salary. Litton's alleged claim of $33,468.89 represented $7,427.25 owed Litton and $26,041.64 owed P. H. Smith which the latter had assigned to Litton for $1 and "other considerations" which Litton was unable to recall. As we have noted, these claims date back over a number of years. The regular salaries paid Litton and Smith were entered on the corporation's books under a "payroll" account; the salary claims here in question were carried under separate accounts, "P. H. Smith—Personal" and "Scott Litton—Personal." No sums were paid Smith from that personal account. The District Court concluded that it was hard to believe that Smith, a bookkeeper and clerk, who had been paid $2,700 a year, should, with no change in the nature of his work, receive a sudden increase in salary to $8,000 a year, except upon an understanding that it was merely for record purposes and not to be paid. This conclusion was strengthened by the fact that the $26,041.64 accumulated for over five years with no effort on Smith's part to col-

District Court disallowed the Litton claim either as a secured or unsecured claim and directed the trustee to recover for the benefit of the estate the property or its value which Litton purchased at the execution sale on June 14, 1934. On appeal the Circuit Court of Appeals reversed that judgment holding that the decision in the state court was *res judicata* in the bankruptcy proceedings.

We think that the Circuit Court of Appeals was in error in reversing the judgment of the District Court.

In the first place, *res judicata* did not prevent the District Court from examining into the Litton judgment and disallowing or subordinating it as a claim. When that claim was attacked in the bankruptcy court Litton did not show that the proceeding in the state court was anything more than a proceeding under Virginia practice to set aside the judgment in his favor on the ground that it was irregular or void upon its face. He failed to show that the judgment in the state court was conclusive in his favor on the validity or priority of the underlying claim, as respects the other creditors of the bankrupt corporation—a duty which was incumbent on him. On the pleadings in the state court the validity of the underlying claim was not in issue. Nor was there presented to the state court the question of whether or not the Litton judgment might be subordinated to the claims of other

---

lect it and by the fact that shortly before bankruptcy he assigned the claim to Litton for a nominal consideration. As to the $7,427.25 alleged to be owed Litton the court likewise concluded that it had been entered on the books for income tax purposes and was not a "bona fide obligation" of the company. Furthermore, a substantial part of these claims was barred by the statute of limitations. On the most tolerant assumption that could be made, according to the court, the salaries credited to Litton and Smith were merely contingent or conditional obligations not provable since they were intended to be paid only whenever the profits of the company permitted. Hence they were not fixed liabilities absolutely owing. See § 63 (a) (1).

creditors upon equitable principles. The motion on which that proceeding was based challenged the Litton judgment on one ground only, viz., that it was void *ab initio* because it was not confessed by Dixie Splint Coal Company in the manner required by the Virginia statute and because P. H. Smith did not have either an implied or express power to confess it. In other words, in the state court under the pleadings and practice, the only decree which was asked or could be given in the plaintiff's favor was for cancellation of the judgment as a record obligation of the bankrupt. It is therefore plain that the issue which the bankruptcy court later considered was not an issue in the trial of the cause in the state court and could not be adjudicated there.[6] Hence, the failure on the part of Litton to establish that the state judgment was *res judicata* plus his submission of his judgment to the bankruptcy court for allowance (as a preferred claim to the extent that it was secured by the alleged lien and as a common claim as respects the deficiency) plainly left the bankruptcy court with full authority to follow the course it took and to determine the validity of Litton's alleged secured claim and the priority which should be accorded it in the distribution of the bankrupt estate. In the second place, even though we assume that the alleged salary claim on which the Litton judgment was based was not fictitious but actually existed, we are of the opinion that the District Court properly disallowed or subordinated it.

Courts of bankruptcy are constituted by §§ 1 and 2 of the Bankruptcy Act (30 Stat. 544) and by the latter

---

[6] It should be noted that there is authority for the conclusion that the trustee is not necessarily precluded from questioning a judgment in the bankruptcy proceedings merely because he attacked it in a state court proceeding, where the state court did not pass upon the validity of the underlying claim. *In re James A. Brady Foundry Co.*, 3 F. 2d 437; Gilbert's Collier on Bankruptcy (4th ed.) § 1247.

304

section are invested "with such jurisdiction at law and in equity as will enable them to exercise original jurisdiction in bankruptcy proceedings." Consequently this Court has held that for many purposes "courts of bankruptcy are essentially courts of equity, and their proceedings inherently proceedings in equity." *Local Loan Co.* v. *Hunt,* 292 U. S. 234, 240. By virtue of § 2 a bankruptcy court is a court of equity at least in the sense that in the exercise of the jurisdiction conferred upon it by the Act, it applies the principles and rules of equity jurisprudence. *Larson* v. *First State Bank,* 21 F. 2d 936, 938. Among the granted powers are the allowance and disallowance of claims; [7] the collection and distribution of the estates of bankrupts and the determination of controversies in relation thereto; [8] the rejection in whole or in part "according to the equities of the case" of claims previously allowed; [9] and the entering of such judgments "as may be necessary for the enforcement of the provisions" of the Act.[10] In such respects the jurisdiction of the bankruptcy court is exclusive of all other courts. *United States Fidelity & Guaranty Co.* v. *Bray,* 225 U. S. 205, 217.

The bankruptcy courts have exercised these equitable powers in passing on a wide range of problems arising out of the administration of bankrupt estates.[11] They

[7] § 2 (2). The sections are cited as they were at the time of the bankruptcy in this case. But the amendments made by the Chandler Act (52 Stat. 840), approved June 22, 1938, are not material so far as the issues here involved are concerned.

[8] § 2 (7).

[9] § 57 (k).

[10] § 2 (15).

[11] Thus the bankruptcy court has been held to have jurisdiction over a supplemental and ancillary bill to enjoin a creditor, after adjudication and discharge of the bankrupt, from prosecuting his claim in a state court. *Local Loan Co.* v. *Hunt, supra.* As a court in equity it has been held to have the power to protect the bankrupt estate against fraudulent assessment, *Cross* v. *Georgia Iron & Coal Co.,* 250 F.

have been invoked to the end that fraud will not prevail, that substance will not give way to form, that technical considerations will not prevent substantial justice from being done. By reason of the express provisions of § 2 these equitable powers are to be exercised on the allowance of claims, a conclusion which is fortified by § 57 (k).[12] For certainly if, as provided in the latter section, a claim which has been allowed may be later "rejected in whole or in part, according to the equities of the case," disallowance or subordination in light of equitable considerations may originally be made.

Hence, this Court has held that a bankruptcy court has full power to inquire into the validity of any claim asserted against the estate and to disallow it if it is ascertained to be without lawful existence. *Lesser* v. *Gray,* 236 U. S. 70. And the mere fact that a claim has been reduced to judgment does not prevent such an inquiry. As the merger of a claim into a judgment does not change its nature so far as provability is concerned, *Boynton* v. *Ball,* 121 U. S. 457, so the court may look behind the judgment to determine the essential nature of the liability

---

438; to compel execution of a deed to make the bankrupt's equitable title a complete legal title, *Dearborn Electric Light & Power Co.* v. *Jones,* 299 F. 432; to recover assets of the estate which have been used to pay dividends under a composition order later reversed, *In re Lilyknit Silk Underwear Co.,* 73 F. 2d 52. And even though the act provides that claims shall not be proved against a bankrupt estate subsequent to six months after the adjudication, the bankruptcy court in the exercise of its equitable jurisdiction has power to permit claims to be proved thereafter in order to prevent a fraud or an injustice. *Williams* v. *Rice,* 30 F. 2d 814; *In re Pierson,* 174 F. 160; *Larson* v. *First State Bank, supra; Burton Coal Co.* v. *Franklin Coal Co.,* 67 F. 2d 796.

[12] Section 57 (k) provides: "Claims which have been allowed may be reconsidered for cause and reallowed or rejected in whole or in part, according to the equities of the case, before but not after the estate has been closed."

for purposes of proof and allowance. *Wetmore* v. *Markoe*, 196 U. S. 68. It may ascertain the validity of liens, marshal them, and control their enforcement and liquidation. *Isaacs* v. *Hobbs Tie & Timber Co.*, 282 U. S. 734. And the bankruptcy trustee may collaterally attack a judgment offered as a claim against the estate for the purpose of showing that it was obtained by collusion of the parties or is founded upon no real debt.[13]

That equitable power also exists in passing on claims presented by an officer, director, or stockholder in the bankruptcy proceedings of his corporation. The mere fact that an officer, director, or stockholder has a claim against his bankrupt corporation or that he has reduced that claim to judgment does not mean that the bankruptcy court must accord it *pari passu* treatment with the claims of other creditors. Its disallowance or subordination may be necessitated by certain cardinal principles of equity jurisprudence. A director is a fiduciary. *Twin-Lick Oil Co.* v. *Marbury*, 91 U. S. 587, 588. So is a dominant or controlling stockholder or group of stockholders. *Southern Pacific Co.* v. *Bogert*, 250 U. S. 483, 492. Their powers are powers in trust. See *Jackson* v. *Ludeling*, 21 Wall. 616, 624. Their dealings with the corporation are subjected to rigorous scrutiny and where any of their contracts or engagements with the corporation is challenged the burden is on the director or stockholder not only to prove the good faith of the transaction but also to show its inherent fairness from the viewpoint of the corporation and those interested therein. *Geddes* v. *Anaconda Copper Mining Co.*, 254 U. S. 590, 599. The essence of the test is whether or not under all the circumstances the transaction carries the earmarks of an

---

[13] *Chandler* v. *Thompson*, 120 F. 940; *In re Thompson*, 276 F. 313; *In re Continental Engine Co.*, 234 F. 58. This is of course in absence of a plea of *res judicata*.

arm's length bargain.[14] If it does not, equity will set it aside. While normally that fiduciary obligation is enforceable directly by the corporation, or through a stockholder's derivative action,[15] it is, in the event of bankruptcy of the corporation, enforceable by the trustee.[16] For that standard of fiduciary obligation is designed for the protection of the entire community of interests in the corporation [17]—creditors as well as stockholders.

As we have said, the bankruptcy court in passing on allowance of claims sits as a court of equity. Hence these rules governing the fiduciary responsibilities of directors and stockholders come into play on allowance of their claims in bankruptcy. In the exercise of its equita-

---

[14] This Court said in *Twin-Lick Oil Co.* v. *Marbury, supra,* p. 590: "So, when the lender is a director, charged, with others, with the control and management of the affairs of the corporation, representing in this regard the aggregated interest of all the stockholders, his obligation, if he becomes a party to a contract with the company, to candor and fair dealing, is increased in the precise degree that his representative character has given him power and control derived from the confidence reposed in him by the stockholders who appointed him their agent. If he should be a sole director, or one of a smaller number vested with certain powers, this obligation would be still stronger, and his acts subject to more severe scrutiny, and their validity determined by more rigid principles of morality, and freedom from motives of selfishness."

[15] *Converse* v. *United Shoe Machinery Co.,* 209 Mass. 539; 95 N. E. 929. *Davenport* v. *Dows,* 18 Wall. 626. It is also clear that breach of that fiduciary duty may also give rise to direct actions by stockholders in their own right. *Strong* v. *Repide,* 213 U. S. 419. Cf. *Green* v. *Victor Talking Machine Co.,* 24 F. 2d 378.

[16] § 70 (a) (6); *Manning* v. *Campbell,* 264 Mass. 386; 162 N. E. 770; *Stephan* v. *Merchants Collateral Corp.,* 256 N. Y. 418; 176 N. E. 824; *Dean* v. *Shingle,* 198 Cal. 652; 246 P. 1049.

[17] See *Wyman* v. *Bowman,* 127 F. 257, 274; *Burnes* v. *Burnes,* 137 F. 781; *Texas Auto Co.* v. *Arbetter,* 1 S. W. 2d 334, 339; *McCandless* v. *Furlaud,* 296 U. S. 140; *Jackson* v. *Ludeling, supra,* pp. 624 *et seq.*

ble jurisdiction the bankruptcy court has the power to sift the circumstances surrounding any claim to see that injustice or unfairness is not done in administration of the bankrupt estate.[18] And its duty so to do is especially clear when the claim seeking allowance accrues to the benefit of an officer, director, or stockholder. That is clearly the power and duty of the bankruptcy courts under the reorganization sections. In *Taylor* v. *Standard Gas & Electric Co.*, 306 U. S. 307, this Court held that the claim of Standard against its subsidiary (admittedly a claim due and owing) should be allowed to participate in the reorganization plan of the subsidiary only in subordination to the preferred stock of the subsidiary. This was based on the equities of the case—the history of spoliation, mismanagement, and faithless stewardship of the affairs of the subsidiary by Standard to the detriment of the public investors. Similar results have properly been reached in ordinary bankruptcy proceedings. Thus, salary claims of officers, directors, and stockholders in the bankruptcy of "one-man" or family corporations have been disallowed or subordinated where the courts have been satisfied that allowance of the claims would not be

[18] Thus in *National Cash Register Co.* v. *Dallen*, 76 F. 2d 867, the bankrupt, prior to bankruptcy, turned in to petitioner an old cash register as a credit on account of the purchase of a new one. Pending delivery of the new machine, petitioner loaned the bankrupt another one and after the bankruptcy adjudication sought to reclaim the loaned machine. The court affirmed an order of the District Court allowing the reclamation on condition that petitioner first deliver to the bankrupt the old machine or pay the amount of its agreed value. The court said, p. 868, "We do not think it necessary to determine whether the contract for the purchase of the new cash register amounted to a bailment lease or a conditional sale. Bankruptcy courts may apply rules regulating equitable actions."

fair or equitable to other creditors.[19]   And that result may be reached even though the salary claim has been reduced to judgment.[20]   It is reached where the claim asserted is void or voidable because the vote of the interested director or stockholder helped bring it into being or where the history of the corporation shows dominancy and exploitation on the part of the claimant.[21]   It is also reached where on the facts the bankrupt has been used merely as a corporate pocket of the dominant stockholder, who, with disregard of the substance or form of corporate management, has treated its affairs as his own.[22]   And so-called loans or advances by the dominant or controlling stockholder will be subordinated to claims of other credi-

---

[19] *In re Burntside Lodge, Inc.*, 7 F. Supp. 785.   In that case the court said, p. 787:

"The relations of a stockholder to a corporation and to the public require good faith and fair dealing in every transaction between the stockholder and the corporation which may injuriously affect the rights of creditors and the general public, and a careful examination will be made into all such transactions in the interests of creditors.

. . . . . .

"If the business had not been incorporated and the Cooks had conducted the enterprise personally, they would not have been allowed compensation for services in the event of bankruptcy, and there is no cogent reason why they should be paid when the same service is rendered as an officer and manager of a corporation of their own creation and to serve their own interests.   To allow claims under such circumstances in effect would permit bankrupts to collect on claims against their own bankrupt estate.   It would give effect to form rather than to substance, to the letter of the law rather than the spirit and purpose of it."

[20] *In re Wenatchee-Stratford Orchard Co.*, 205 F. 964.

[21] *In re McCarthy Portable Elevator Co.*, 196 F. 247, aff'd 201 F. 923.

[22] *In re Chas. K. Horton, Inc.*, 22 F. Supp. 905; *In re Kentucky Wagon Mfg. Co.*, 71 F. 2d 802; *Forbush Co. v. Bartley*, 78 F. 2d 805; *Clere Clothing Co. v. Union Trust & Savings Bank*, 224 F. 363.

tors and thus treated in effect as capital contributions by the stockholder not only in the foregoing types of situations but also where the paid-in capital is purely nominal, the capital necessary for the scope and magnitude of the operations of the company being furnished by the stockholder as a loan.[23]

Though disallowance of such claims will be ordered where they are fictitious or a sham,[24] these cases do not turn on the existence or non-existence of the debt. Rather they involve simply the question of order of payment.[25] At times equity has ordered disallowance or subordination by disregarding the corporate entity.[26] That is to say, it has treated the debtor-corporation simply as a part of the stockholder's own enterprise, consistently with the course of conduct of the stockholder. But in that situation as well as in the others to which we have referred, a sufficient consideration may be simply the violation of rules of fair play and good conscience by the claimant;

---

[23] *Albert Richards Co.* v. *Mayfair, Inc.*, 287 Mass. 280; 191 N. E. 430. Cf. *Erickson* v. *Minnesota & Ontario Power Co.*, 134 Minn. 209; 158 N. W. 979; *Oriental Investment Co.* v. *Barclay*, 64 S. W. 80 (Tex. Civ. App.); *Joseph R. Foard Co.* v. *State*, 219 F. 827.

[24] *New York Trust Co.* v. *Island Oil & Transport Corp.*, 34 F. 2d 655; *In re H. Hicks & Son, Inc.*, 82 F. 2d 277.

[25] See comment in 45 Yale L. Journ. 1471.

[26] *In re Otsego Waxed Paper Co.*, 14 F. Supp. 15. The court said, p. 16, "The applicable principle is that, where a corporation is so organized and controlled as to make it a mere instrumentality or adjunct of another, and the subsidiary becomes bankrupt, the parent corporation cannot have its claim paid until all other claims are first satisfied." See also *Hunter* v. *Baker Motor Vehicle Co.*, 225 F. 1006; *Henry* v. *Dolley*, 99 F. 2d 94.

The same result has been reached in equity receiverships. *Central Vermont Ry. Co.* v. *Southern New England R. Corp.*, 1 F. Supp. 1004, aff'd 68 F. 2d 460; *S. G. V. Co.* v. *S. G. V. Co.*, 264 Pa. 265; 107 A. 721.

*A fortiori* that result is reached where there is a fraudulent purpose. *E. E. Gray Corp.* v. *Meehan*, 54 F. 2d 223.

a breach of the fiduciary standards of conduct which he owes the corporation, its stockholders and creditors. He who is in such a fiduciary position cannot serve himself first and his *cestuis* second. He cannot manipulate the affairs of his corporation to their detriment and in disregard of the standards of common decency and honesty. He cannot by the intervention of a corporate entity violate the ancient precept against serving two masters.[27] He cannot by the use of the corporate device avail himself of privileges normally permitted outsiders in a race of creditors. He cannot utilize his inside information and his strategic position for his own preferment. He cannot violate rules of fair play by doing indirectly through the corporation what he could not do directly. He cannot use his power for his personal advantage and to the detriment of the stockholders and creditors no matter how absolute in terms that power may be and no matter how meticulous he is to satisfy technical requirements. For that power is at all times subject to the equitable limitation that it may not be exercised for the aggrandizement, preference, or advantage of the fiduciary to the exclusion or detriment of the *cestuis*. Where there is a violation of those principles, equity will undo the wrong or intervene to prevent its consummation.

On such a test the action of the District Court in disallowing or subordinating Litton's claim was clearly correct. Litton allowed his salary claims to lie dormant for years and sought to enforce them only when his debtor corporation was in financial difficulty. Then he used them so that the rights of another creditor were impaired. Litton as an insider utilized his strategic position for his own preferment to the damage of Pepper. Litton as the dominant influence over Dixie Splint Coal Company used his power not to deal fairly with the

---

[27] See *Alexander* v. *Theleman*, 69 F. 2d 610, 613.

creditors of that company but to manipulate its affairs in such a manner that when one of its creditors came to collect her just debt the bulk of the assets had disappeared into another Litton company. Litton, though a fiduciary, was enabled by astute legal manoeuvring to acquire most of the assets of the bankrupt not for cash or other consideration of value to creditors but for bookkeeping entries representing at best merely Litton's appraisal of the worth of Litton's services over the years.

This alone would be a sufficient basis for the exercise by the District Court of its equitable powers in disallowing the Litton claim. But when there is added the existence of a "planned and fraudulent scheme," as found by the District Court, the necessity of equitable relief against that fraud becomes insistent. No matter how technically legal each step in that scheme may have been, once its basic nature was uncovered it was the duty of the bankruptcy court in the exercise of its equity jurisdiction to undo it. Otherwise, the fiduciary duties of dominant or management stockholders would go for naught; exploitation would become a substitute for justice; and equity would be perverted as an instrument for approving what it was designed to thwart.

The fact that Litton perfected his lien more than four months preceding bankruptcy is no obstacle to equitable relief. In the first place, that lien was but a step in a general fraudulent plan which must be viewed in its entirety. The subsequent sale cannot be taken as an isolated step unconnected with the long antecedent events, all designed to defeat creditors. *Buffum* v. *Peter Barceloux Co.*, 289 U. S. 227, 232–233. In the second place, Litton is seeking approval by the bankruptcy court of his claim. The four months' provision of the bankruptcy act is certainly not a statutory limitation on equitable defenses arising out of a breach of fiduciary duties by him who seeks allowance of a claim.

In view of these considerations we do not have occasion to determine the legitimacy of the "one-man" corporation as a bulwark against the claims of creditors.[28]

Accordingly the judgment of the Circuit Court of Appeals is reversed and that of the District Court is affirmed.

*Reversed.*

---

[28] On this point the District Court said: "An examination of the facts disclosed here shows the history of a deliberate and carefully planned attempt on the part of Scott Litton and Dixie Splint Coal Company to avoid the payment of a just debt. I speak of Litton *and* Dixie Splint Coal Company because they are in reality the same. In all the experience of the law, there has never been a more prolific breeder of fraud than the one-man corporation. It is a favorite device for the escape of personal liability. This case illustrates another frequent use of this fiction of corporate entity, whereby the owner of the corporation, through his complete control over it, undertakes to gather to himself all of its assets to the exclusion of its creditors."