George W. BRADDY, Appellant,

v.

Clyde C. RANDOLPH, Jr., Trustee in Bankruptcy for Master Builders, Inc., bankrupt, North Carolina National Bank, Salem Electric Company, Piedmont Construction Company, Industrial Roofing Company, Inc., Dillard Paper Company, Dixie Concrete Products, Inc., Amaar Company, Brenner Iron & Metal Company, Kenneth E. Foster, I. H. Zeliff, and S. I. Craft, Jr., Appellees.

No. 9782.

United States Court of Appeals Fourth Circuit.

Argued March 2, 1965.

Decided Oct. 19, 1965.

George W. Braddy, pro se.

Charles F. Vance, Jr., Winston-Salem, N. C. (Wade M. Gallant, Jr., Winston-Salem, N. C., on brief), for appellee Clyde C. Randolph, Jr., Trustee.

William S. Mitchell, Winston-Salem, N. C., for appellees Amaar Co. and Brenner Iron & Metal Co.

Before HAYNSWORTH, Chief Judge, and SOBELOFF and BOREMAN, Circuit Judges.

BOREMAN, Circuit Judge:

Following the filing of an involuntary petition in bankruptcy against Master Builders, Inc., a North Carolina corporation (hereinafter Bankrupt), on June 7, 1963, the corporation was adjudged bankrupt and a trustee was appointed. Subsequently, several tracts of real property, which constituted the principal assets of the Bankrupt and on which deeds of trust had been given to secure loans made to the Bankrupt, were ordered sold free and clear of liens with the claims of the creditors, upon determination, to be transferred to the proceeds from the sale. The present controversy stems from an order entered by the referee which determined the amount, validity and priority of the claims filed by the secured and general creditors of the Bankrupt against the sale proceeds.

Appellant, George Braddy, a principal stockholder, a director and the president of the Bankrupt, filed four claims which were based on four notes secured by deeds of trust which the Bankrupt had issued to him and the other stockholders and

officers for money "loaned" the Bankrupt. Two notes in the amounts of $18,000 and $6,382.78 were payable to Braddy and were dated June 6, 1962, and December 6, 1962, respectively. The other notes in the amounts of $12,500 and $3,000 were payable to the four officers, Braddy, Zeliff, Craft and Foster, who were also the sole stockholders of the Bankrupt, and two of their wives, Mrs. Foster and Mrs. Zeliff, and were dated April 8, 1963. The referee rejected all four claims on the ground that the "loans" evidenced by the notes were actually contributions to the capital of the Bankrupt as it had been undercapitalized from its inception. The referee also found that the deeds of trust given to secure the notes of April 8, 1963, constituted preferences as they were given as security for antecedent debts within four months of the date the petition was filed, at a time when the Bankrupt was insolvent. On petition for review the District Court upheld the findings of the referee and Braddy alone prosecutes this appeal. After examining the record we conclude that these findings were supported by substantial evidence and not clearly erroneous which is the test to be applied. Mountain Trust Bank v. Shifflett, 255 F.2d 718 (4 Cir. 1958).

That the Bankrupt, from the very beginning, was undercapitalized for its proposed objects, purposes and undertakings is clear from the evidence. The Bankrupt was formed on or about June 1, 1960, by Braddy, Foster, Zeliff and Craft for the purpose of engaging in a general construction business with a total equity capital of only $6,000 which was represented by 600 shares of stock issued equally to the four incorporators. Of this amount only $2,000 was cash, the remainder being represented by other assets. On this ridiculously small amount of capital the Bankrupt launched into extensive construction projects by acquiring land and erecting thereon homes and commercial buildings which it sold or rented. The cost of some of the larger commercial projects ran into hundreds of thousands of dollars. The extent of the Bankrupt's business activity is apparent from its balance sheets at the end of each year of operation.[1] Also, in the three years of its existence the Bankrupt sustained losses of $123,000 consisting of $8,000 the first year, $25,000 the second year and $90,000 the last year. The $8,000 loss in the first year alone exceeded the equity capital of $6,000.

To finance this volume and to keep the business going even though operating at a loss, the Bankrupt borrowed heavily and constantly from the four officers and the North Carolina National Bank (hereinafter Bank). The money which the officers, Braddy, Zeliff, Craft and Foster, "loaned" the Bankrupt was normally acquired from the Bank by use of their personal credit and personal assets. Based on the volume of business and the fact that the Bankrupt began borrowing from the officers and the Bank at the outset of operations, we think the referee and court could reasonably conclude that these "loans" were necessitated by the initial insufficiency of the Bankrupt's equity capital and that the "loans" made by the officers were, in effect, contributions to capital. Securities & Exchange Com'n v. Liberty Baking Corp., 240 F.2d 511, 515 (2 Cir. 1957). Rather than invest more capital the officers and stockholders, by the use of the borrowed funds, substantially shifted and evaded the ordinary financial risks connected with this type of business enterprise and, at the same time, permitted the corporation to remain in a constant state of or in imminent danger of insolvency.

1.

| | Year Ending 5-31-61 | Year Ending 5-31-62 | Year Ending 5-31-63 |
|---|---|---|---|
| Assets | $343,885.38 | $440,053.91 | $247,135.30 |
| Liabilities | $345,885.74 | $467,977.25 | $366,103.88 |

Not only was the Bankrupt undercapitalized but the evidence reveals also that the officers and stockholders acted to protect their own interests at the expense of other creditors. The "loans" which Braddy now seeks to recover were made in the last fiscal year of the Bankrupt's existence, or between June 1, 1962, and May 31, 1963. The major project of the Bankrupt during that year was the construction of a large building which was to be leased to the United States for use as a Post Office. The $18,000 which Braddy "loaned" to the Bankrupt on June 6, 1962, was used to purchase the land on which the Post Office was to be built. As security for his "loan" Braddy accepted a deed of trust on the land. To obtain from the Bank the funds with which to construct the Post Office, Braddy agreed to subordinate his lien on the land to a deed of trust given to the Bank by the Bankrupt to secure a loan of $90,000. At the time these loans were made the Bankrupt was already in considerable financial difficulty. Six days before, on May 31, 1962, the liabilities of the Bankrupt exceeded its assets by $27,923.34. Even so, the loans were made and deeds of trust in the aggregate amount of $108,000 were given as security on a vacant lot with a fair market value of approximately $20,000. As the deeds of trust to Braddy and the Bank were recorded before materials were furnished or construction was begun on the Post Office, Braddy and the Bank had obtained liens senior in priority to any which subcontractors or materialmen might expect to acquire for furnishing supplies and labor to erect the building. The Bank paid out the $90,000 to the Bankrupt in three installments. Instead of using the money from this loan to pay the subcontractors and materialmen, the Bankrupt used the major part of these funds to pay prior obligations of the Bankrupt and notes due on other construction projects. Braddy asserts, however, that he was unaware that the borrowed funds were being diverted to other projects and to pay old debts as he was not managing the Bankrupt; therefore,

he should not be punished. Even assuming that he did not know these facts, he should be charged with such knowledge as president and a member of the board of directors of Bankrupt. His claimed good faith and lack of knowledge, however, appear to be overshadowed by other events connected with the same construction project and in which he was directly involved.

To comply with the terms of the lease with the United States the Bankrupt was required to give a performance and material payment bond in the amount of $112,500. The Bankrupt was unable to obtain the bond so it entered into an escrow agreement on June 8, 1962, whereby the Bankrupt agreed to and did deposit the sum of $112,500 in an escrow account with the Bank as the acceptable equivalent of bond requirements. To obtain the funds deposited in the escrow account the four officers of the Bankrupt, Braddy, Zeliff, Craft and Foster, and two of their wives, Mrs. Foster and Mrs. Zeliff, obtained a personal loan from the Bank and then lent the money to the Bankrupt. Lacking the necessary capital to complete the Post Office building, on April 8, 1963, the Bankrupt applied for an additional loan of $80,000 from the Bank. The Bank rejected the application and suggested to the officers that they get the escrow account released. Thereupon the Bankrupt obtained a letter from the Post Office Department consenting to release all but $3,000 of the escrow fund. On April 12, 1963, the officers, obviously knowing that a number of materialmen had not been paid and that the Bankrupt was insolvent, obtained $111,151.55 of funds held in the escrow account (being all the funds originally deposited plus earnings from investment of the funds, less $3,000) and applied the released funds to the payment of their personal note to the Bank.

On the day the Bank refused the $80,000 loan and advised the officers to obtain the release of the escrow account, the officers issued to themselves the $12,500 and $3,000 notes on which Braddy now seeks to recover. These

notes, which were secured by deeds of trust on some unencumbered property of the Bankrupt, were given for some "loans" which the officers had made to the Bankrupt during January and February of 1963. Having obtained the release of the escrow funds, having used them to pay their personal note of $112,-500 to the Bank with knowledge that persons for whose benefit and protection this security had been intended had not been paid, and having obtained deeds of trust to secure their personal loans to the Bankrupt on perhaps the only unencumbered property of the Bankrupt, the officers called a creditors' meeting on the first of the following week, announced that they were through and that the creditors could have the business.

Based on these facts the court below was justified in concluding that Braddy and the other officers of the Bankrupt had not acted in good faith and for the best interests of the Bankrupt and its creditors. A court of bankruptcy is a court of equity which exercises broad equitable powers; it is empowered to "sift the circumstances surrounding any claim to see that injustice or unfairness is not done in administration of the bankrupt estate. And its duty so to do is especially clear when the claim seeking allowance accrues to the benefit of an officer, director, or stockholder." Pepper v. Litton, 308 U.S. 295, 308, 60 S.Ct. 238, 246, 84 L.Ed. 281 (1939). A sufficient basis for rejecting the claims of an officer, director or stockholder may be simply the violation of the rules of fair play and good conscience or a breach of the standards of conduct which an officer or director in his fiduciary capacity owes the corporation, its stockholders and creditors. Pepper v. Litton, supra, at 310–311, 60 S.Ct. 238.

Having reached the conclusion for the foregoing reasons that the District Court and referee committed no error in rejecting Braddy's claims, we deem it unnecessary to discuss the second finding below that the deeds of trust given on April 8, 1963, constituted preferences.

Affirmed.