Martha Maytag **DANNERBECK,**
Plaintiff-Appellee,

v.

Oscar C. **PALMER,** Sr., et al.,
Defendants,

Al A. **Marth,** Trustee in Bankruptcy of
Pete Horner Excavating, Inc.,
Defendant-Appellant.

No. 72–3201.

United States Court of Appeals,
Ninth Circuit.

July 17, 1974.

Rehearing Denied Aug. 12, 1974.

Certiorari Denied Dec. 9, 1974.
See 95 S.Ct. 626.

John C. Hughes (argued), Hughes, Hughes & Conlan, Phoenix, Ariz., for defendant-appellant.

Kenneth J. Sherk (argued), Robbins & Green, Phoenix, Ariz., for Dannerback.

Keith W. Ragan (argued), Phoenix, Ariz., for Palmer.

Before HAMLEY, MERRILL and WRIGHT, Circuit Judges.

OPINION

HAMLEY, Circuit Judge:

Al A. Marth, Trustee in Bankruptcy of Pete Horner Excavating, Inc. (Horner Excavating) appeals from a declaratory judgment in this diversity action in favor of Martha Maytag Dannerbeck and Oscar C. and Corinne E. Palmer, husband and wife. We affirm.

Initially, two actions for declaratory relief were filed, one by United States Fidelity and Guaranty Company (USF&G) and the other by National Union Fire Insurance Company of Pittsburgh, Pennsylvania (National Union). These plaintiffs, as sureties for Horner Excavating, a bankrupt contractor which had defaulted on city street contracts,

sought a declaratory judgment that plaintiffs were entitled to receive the proceeds of six city improvement district contracts to the extent they had paid to complete the contracts under performance bonds and had paid claims of laborers and materialmen under payment bonds.

The plaintiff surety companies named, as defendants, Oscar Palmer and Mrs. Palmer, the Arizona municipalities of Phoenix and Prescott, and Marth, the contractor's Trustee in Bankruptcy. Palmer had advanced monies to the contractor and claimed the contract proceeds by virtue of assignments. The named municipalities had entered into contracts with Horner Excavating to perform the street contracts in question.

The defendant cities asserted no right to the contract proceeds. Pursuant to stipulation, those proceeds, consisting of cash and municipal bonds, were deposited with a bank in Phoenix to be invested and abide the outcome of the litigation. When it was revealed by pretrial discovery that Mrs. Dannerbeck, as idemnitor, had paid both sureties the full amount of her indemnity obligation, she was, pursuant to stipulation and order, substituted as plaintiff in each action. She then sought, as subrogee of the surety companies, to recover the proceeds of the city street improvement contracts to the extent she had paid the surety companies. Subsequently, the two actions were consolidated.

After extensive pretrial proceedings, Mrs. Dannerbeck, Palmer and the trustee each moved for summary judgment. The result was entry of a declaratory judgment to the effect that Mrs. Dannerbeck was entitled to first priority in and to the funds, that Palmer was entitled to first priority in and to the balance of the funds, and that the trustee was not entitled to any of the funds. At all times the combined claims of Mrs. Dannerbeck and Palmer exceeded the funds in question. Only the trustee has appealed.

The trustee advances separate arguments against Mrs. Dannerbeck and Palmer, and also contends that the district court was without jurisdiction in this plenary suit based on diversity of citizenship, because exclusive jurisdiction over the claims of Mrs. Dannerbeck and Palmer rested in the bankruptcy court. Ordinarily we give first attention to jurisdictional challenges. However, this particular jurisdictional issue is premised on a factual background which can best be developed by first discussing the other issues.

*Martha Dannerbeck's right of subrogation*

With regard to Mrs. Dannerbeck's right to the contract proceeds, the trustee advances three arguments. The first two of these arguments are related, and will be considered together. They are: (1) the equities of the case do not favor the right of subrogation being given to Mrs. Dannerbeck, and (2) the equitable right of subrogation will arise in a surety only in the event of loss and it is a right that will not carry over to one who indemnifies a surety when such indemnitor is also a principal and in fact made payment in place of the surety.

The total contract proceeds available aggregated $579,137.42. Of this sum Mrs. Dannerbeck claimed $405,969.56, comprised of the following items: $323,375.32 of the improvement district proceeds under equitable subrogation on a job by job basis, $81,686.00 paid by National Union on two gas tax jobs, and $908.24 paid to USF&G on the Contractor's License Bond by subrogation to the sureties' positions under the assignments in the Indemnity Agreements.

The trustee concedes that if the two surety companies had themselves made good the defaults of Horner Excavating, without indemnification, they would then have been entitled to recover their expenditures from the proceeds of the vari-

ous contracts.[1] The trustee also recognizes the general equitable principle that an indemnitor is entitled to be subrogated to the rights of a surety.[2] However, the trustee asserts that the foregoing principle does not apply under the circumstances of the case now before us.

The circumstances upon which the trustee relies are as follows: In October of 1963, Martha Dannerbeck's cousin, Pete Horner, and her husband, Jon L. Dannerbeck, formed a partnership, and in April, 1964, they decided to incorporate. Horner put into the corporation his two pieces of equipment which he valued at from twelve to fourteen thousand dollars, and received twelve to fourteen thousand shares of corporate stock. Jon L. Dannerbeck told his wife his participation would be six thousand dollars and she wrote him a check in that amount which was deposited in their joint bank account. He then wrote a check on that account in the amount of six thousand dollars, paid it to the corporation, and received approximately six thousand shares of stock.

Upon incorporation of Horner Excavating, Horner became President-Treasurer and Dannerbeck became Vice President-Secretary of the corporation. Both were made directors of the corporation. There was no further infusion of equity capital into the corporation, although thereafter it entered into contracts having an aggregate value of about one million dollars.

The statutes then in force in Arizona required any general contractor on improvement district contracts to post, as a condition of his contract, two bonds. One of these was to be conditioned upon the faithful performance of the contract in a sum not less than one-fourth of the contract price. The other was to be for the benefit of all persons who may have claims against the contractor or subcontractor for labor, materials or services used in the work, in a sum not less than one-half of the total amount of the contract.

Of the six improvement district contracts in question, two were bonded by USF&G and the remaining four were bonded by National Union. It was for the purpose of obtaining these surety bonds that Mrs. Dannerbeck, along with her husband, Horner and the corporation, executed the joint and several indemnity agreements in question. Mrs. Dannerbeck testified that her purpose in executing the agreement was to assist the place where her husband was employed and "to assist Jon in getting along in the business he was in." [3]

The Dannerbecks' association with the corporation continued up to late 1965. Jon Dannerbeck resigned as a corporate officer and director on December 3, 1965, and sold his stock to Pete Horner. Thereafter, and while the indemnity agreements in question were in full effect, Horner Excavating defaulted on all of the contracts in question by failing to pay laborers and materialmen and by failing to complete work on three of the contracts. Horner Excavating was adjudicated a bankrupt on July 8, 1966. Thereafter, the Dannerbecks, through their attorney, from time to time settled the amounts of the various claims covered by the surety and indemnity agreements, and sent trust checks signed by the attorney to the surety companies

1. *See* Pearlman v. Reliance Insurance Company, 371 U.S. 132, 83 S.Ct. 232, 9 L.Ed.2d 190 (1962); Henningsen v. United States Fidelity and Guaranty Co., 208 U.S. 404, 28 S.Ct. 389, 52 L.Ed. 547 (1908); Prairie State Bank v. United States, 164 U.S. 227, 17 S.Ct. 142, 41 L.Ed. 412 (1896).

2. *See generally* Reid v. Pauley, 121 F. 652 (9th Cir. 1903); Massachusetts Bonding and Insurance Company v. Osborne, 233 Cal. App.2d 648, 43 Cal.Rptr. 761 (1965);

Westerhold v. Carroll, 419 S.W.2d 73 (Mo. 1967); Longview School District No. 112 of Cowlitz County v. Stubbs Electric Co., 160 Wash. 465, 295 P. 186 (1931); Stubbs Electric Co. v. Longview School District No. 112 of Cowlitz County, 153 Wash. 33, 279 P. 86 (1929); 11 Appleman, Insurance Law and Practice § 6683 (1944).

3. All testimony referred to in this opinion was given by deposition.

which, in turn, issued their checks in the same amount to the claimants. These payments by the Dannerbecks were made from a joint trust account established by the Dannerbecks, but to which Mrs. Dannerbeck made the sole contribution from her separate property.

The circumstances described above, the trustee asserts, demonstrate that: (1) the corporation, in which Mrs. Dannerbeck had a community property interest, was grossly undercapitalized; (2) Mrs. Dannerbeck's indemnity agreement was therefore, in effect, a contribution to capital, for the purpose of furthering Mrs. Dannerbeck's interest in the corporation; (3) it was thus the power of the Dannerbeck name and property that allowed the massive indebtedness to accumulate against the minimal financing of Horner Excavating; and (4) the described method of paying the claims, whereby the surety companies did not make payouts until they had received checks from the joint trust account corroborates the fact that Mrs. Dannerbeck was acting as a principal and not as an independent indemnitor.

Premised on these circumstances, the trustee calls for application of the principle announced in Wood v. Steele, 73 U.S. (6 Wall.) 80, 82, 18 L.Ed. 725 (1867), that

" . . . where one of two innocent persons must suffer, he who has put it in the power of another to do the wrong, must bear the loss, . . ." [4]

The trustee finds a parallel between this case and Braddy v. Randolph, 352 F.2d 80 (4th Cir. 1965). In that case the court rejected the claims of a person who was a principal stockholder, director and president of a bankrupt corporation, based on four secured notes issued to him by the corporation for money "loaned" to the corporation. The claims were rejected on the ground that the "loans" were actually contributions to the capital of the bankrupt which had been undercapitalized from its inception. Said the court:

"Rather than invest more capital the officers and stockholders, by the use of the borrowed funds, substantially shifted and evaded the ordinary financial risks connected with this type of business enterprise and, at the same time, permitted the corporation to remain in a constant state of or in imminent danger of insolvency." (352 F.2d at 82.)

The trustee also argues that the equitable right of subrogation is not available to an indemnitor who is also a principal and in fact made payment in place of the surety. In this connection the trustee cites 50 Am.Jur., Subrogation § 20, at 695, for the proposition that

"The excluded classes are composed of those who discharge debts upon which their liability is primary. . . . "

Pointing out that subrogation is a creature of equity not dependent on contract but upon the equities of the parties, the trustee asserts that to allow subrogation under the facts and circumstances of this case would do violence to equity and rather than promote justice it would work an injustice to the general creditors.

The foregoing, which describes the trustee's contentions in summary form, omitting some supporting arguments and authorities, presents a rather persuasive argument for denial of the right of subrogation to Mrs. Dannerbeck.

But there are countervailing circumstances and arguments which must also be considered. Unlike the claimant in the *Braddy* case, *supra*, Mrs. Dannerbeck was not a director or officer of the corporation, nor was she even a minority stockholder unless her six thousand dollar payment to Jon so that he could pur-

4. *See also* National Savings Bank v. Cresswell, 100 U.S. 630, 643, 25 L.Ed. 713 (1879); Carpenter v. Longan, 83 U.S. (16 Wall.) 271, 273, 21 L.Ed. 313 (1872); Bolivar Reorganized School District No. 1 v. American Surety Company of New York, 307 S.W.2d 405, 410 (Mo.1957).

chase corporate stock was a contribution to community property rather than an outright gift to him. Except for the possibility that she had contributed the six thousand dollars to the community property (a fact not established in the record), her only beneficial interest in the corporation was her community property interest in Jon's corporate salary.

The construction contract funds to which the trustee is laying claim have never been a part of the bankrupt's estate available to the general creditors. The funds never became due and owing to Horner Excavating because that corporation defaulted in its performance of the contract.

Nor is it established in the record that Horner Excavating's inability to complete the contracts was due to undercapitalization, although the company did have a working capital problem. There may have been any number of other reasons for the default: inexperienced and incompetent management;[5] bids which were too low; unmanageable labor and material problems;[6] involvement with other companies to the disadvantage of Horner Excavating;[7] and accidents.[8]

It should also be noted that the company's financial standing was not entirely dependent upon the indemnity contract, since it received substantial financing through appellee Oscar C. Palmer as described in another section of this opinion.

■ Unlike the cases cited by the trustee, Mrs. Dannerbeck did not purport to loan money to the corporation. She took no part in the business affairs of the corporation, other than to guarantee certain loans to the corporation and to execute the indemnity agreements. She executed a normal indemnity contract such as surety companies frequently require. Her indemnity agreement was acceptable to the sureties because of her substantial separate property. While the sureties were paid from a joint trust account, the corpus of that trust consisted exclusively of Mrs. Dannerbeck's separate property.

Had the surety companies settled and paid the claims themselves, they could have proceeded against the contract funds as subrogees. Or they could have moved against Mrs. Dannerbeck as indemnitor. The fact that she chose to settle the claims and advance funds to

5. Pete Horner, who headed the contracting company, was only about nineteen years old when the contracting corporation was organized in April, 1964. He had first worked for some construction people for a couple of summers. He entered into the street improvement business on his own less than a year before incorporating the contracting company which bears his name. Initially a backhoe rental concern, this business consisted of doing jobs for different contractors.

At the time Horner and Jon Dannerbeck first entered into a partnership, in October, 1963, Jon was about twenty-five years old and had been going to the University of Wisconsin. He was then unemployed. Horner testified that Jon Dannerbeck wasn't really interested in the company, "had other things going," and was "going on trips and stuff."

The corporation did not get into the improvement district kind of work until about September, 1964. The partnership's business aggregated about sixty thousand dollars prior to the incorporation, and consisted primarily of constructing driveways and excavating.

6. Pete Horner testified that a strike, and the company's failure to take effective counter measures, got the company into trouble.

7. Pete Horner testified that the contracting company had a thirty thousand dollar loss when a company they had borrowed from, Union Title, "went down." He also testified that he and two others had been stockholders in See Bee Slurry-Matic, which engaged in street maintenance through the use of asphalt. One of the other stockholders agreed to buy Pete Horner's See Bee stock but he failed to do so and Horner Excavating had to take over that company.

8. Pete Horner testified that just as Horner Excavating was finishing up a job in Prescott, a wall fell over and killed a little girl "and so that threw everything into an uproar and there was some lawsuits flying around and some arguments, and it just took a lot of money and a lot of time and finally that got straightened out and the blame was put on the engineer up there."

the sureties, in advance of payments by them, does not alter the basic fact that she was discharging an indemnitor's obligation. To hold otherwise would be to exalt form over substance.

Allowing Martha Dannerbeck the right of subrogation does not inflict any injustice on the general creditors because if the labor and material claims had not been paid by the sureties or Martha Dannerbeck, the funds in question would, in any event, not have been available to the general creditors but would have gone directly to the laborers and materialmen. *See* Jacobs v. Northeastern Corporation, 416 Pa. 417, 206 A.2d 49 (1965); In re Dutcher Construction Corporation, 378 F.2d 866 (2d Cir. 1967). This might not be an adequate answer to the trustee if it had been definitely shown that Horner Excavating's undercapitalization caused that corporation's defaults under the six street-improvement contracts in question. But, as noted above, no such showing was made and, indeed, it was not shown that a substantial contribution to the corporation's capital by Mrs. Dannerbeck would have satisfied the sureties so that they would not have required the indemnity agreements.

■ On balance, we conclude that there is no compelling "equity" in favor of the general creditors which calls for disregard of the general rule that an indemnitor who has fulfilled its obligation to a surety pursuant to the indemnity agreement, is subrogated to all rights which the surety has with respect to available funds.[9]

The trustee's third reason why Mrs. Dannerbeck should not be granted the right of subrogation with respect to the funds in question is based on the fact that she did not seek contribution from the co-indemnitors, and particularly Pete Horner. The trustee calls our attention to testimony to the effect that Pete Horner visited the Dannerbecks in 1968 and told them he wanted to pay them what he owed them. According to Mrs. Dan-

nerbeck, Mr. Horner had funds in trust with which this could have been accomplished. Mrs. Dannerbeck, however, did not pursue this avenue of recovery or seek any contribution from her co-indemnitors.

The trustee cites authority to the effect that while each of the co-indemnitors was liable to the sureties for the full amount of the undertaking, as between themselves, each is primarily liable for only a portion of the debt, and thus is entitled to contribution from the co-indemnitors. Accepting this to be a correct statement of the law, the question remains whether a co-indemnitor who has fully discharged his liability to the surety is compelled to seek contribution from his co-indemnitors before he may proceed, by way of subrogation, against available funds.

■ The trustee cites no authority for the proposition that, in these circumstances, an indemnitor who has paid his obligation must proceed first against his co-indemnitors for contribution before pursuing his subrogation rights. Nor have we found any support in the books for such a proposition. As a general rule, and apart from election of remedies problems not presented by the case now before us, a party may pursue any remedy the law gives. *See* Abdallah v. Abdallah, 359 F.2d 170, 174 (3rd Cir. 1966). Accordingly, we hold that Mrs. Dannerbeck is not to be denied her right of subrogation by reason of the fact that she did not first seek contribution from the co-indemnitors.

### Oscar Palmer's right to the balance of the contract funds

As before stated, the judgment under review, after adjudicating that Mrs. Dannerbeck is entitled to first priority in and to the available funds, adjudicated that Palmer is entitled to first priority in and to the balance of the funds. The exercise of these two priorities would exhaust the funds and leave nothing for the trustee.

9. *See* authorities cited in note 2, *supra.*

Palmer's claim to the funds is based upon his alleged purchase of the improvement bonds to be issued upon completion of the contracts Horner Excavating had with the cities and improvement districts. Horner Excavating's purpose in selling these bonds to Palmer was to obtain additional financing for completion of its various projects. In each instance the purchase of the bonds took the form of a letter prepared and signed by Palmer and accepted by Horner Excavating. The forms of assignment of the proceeds of the contracts were executed by Horner Excavating in favor of Palmer and were lodged with and acknowledged by the municipalities. The assignments referred to "indebtedness" and provided that "this assignment shall stand as security for all indebtedness."

■ The trustee asserts that these purchase agreements contain conditions precedent to the obligation of the purchaser to accept the finished article, and that therefore title to the bonds could not pass to Palmer until the conditions had been satisfied. The principal conditions precedent upon which the trustee relies are exemplified by these recitals in the letter agreements:

"at the time of delivery these bonds are to be accompanied by the final approving opinion of Messrs. Gust, Rosenfeld, Divelbess and Robinette of Phoenix, Arizona."

"If for any reason these bonds are not promptly issued in the regular manner or should the job not be completed in average time required for this size of job, you are to promptly refund the amount we have then advanced to you upon written demand."

The trustee contends that because the job was not completed in the "average time required," and because no "final approving opinion" was issued, these as-

serted conditions precedent failed, and title to the bonds never passed to Palmer. Therefore, the trustee urges, Horner Excavating's liability to Palmer at the time of bankruptcy was simply to refund the amounts advanced by Palmer. This would place Palmer in the position of an unsecured creditor in the bankruptcy proceedings.[10]

Palmer's response is that the conditions in the contract are simply conditions on Palmer's obligation to accept the bonds. In effect, Palmer retained the option of rejecting the bonds if the conditions were not met, thereby transforming Horner Excavating's obligation into a money debt. It should be noted that such transformation does not occur automatically upon Horner Excavating's failure to meet the conditions specified; rather, it occurs only if the conditions are not met *and* Palmer provides a written demand for return of the funds advanced. The option clearly is Palmer's, and the trustee's argument that the obligation is automatically transformed into a money debt upon failure of the conditions appears to be untenable.

■ More importantly, the trustee discusses only the language of the letter agreements and virtually ignores the existence of the written assignments of the contract proceeds executed by Horner Excavating and accepted by the municipalities. Although the assignments contain numerous errors with regard to identification of parties, they clearly were effective to transfer to Palmer the right to receive the proceeds of the contracts. The fact that in the letter agreements Palmer reserved the right to reject the bonds would not appear to affect the validity of the assignments.

■ Palmer correctly points out that an assignment of a debt not yet due

---

10. The trustee believes his contention is strengthened by the fact that the assignments contain this provision:
"This assignment is made as security for the payment of any and all indebtedness. . . ."

However, we question whether the quoted language tends to place Palmer in the position of an unsecured creditor.

is effective if there is an existing contract out of which the debt may arise. *See, e. g.,* Valley National Bank of Arizona v. Byrne, 101 Ariz. 363, 419 P.2d 720 (1966). Since the contract proceeds were thus effectively assigned to Palmer, then on the date of bankruptcy Horner Excavating had no property interest in the proceeds which could vest in the trustee pursuant to section 70(a) of the Bankruptcy Act.

We therefore hold that the district court did not err in determining that Palmer had first priority in the balance of the funds in question.

### District court jurisdiction

The trustee asserts that as soon as pretrial discovery revealed the fact that the surety companies did not pay the claims filed against Horner Excavating until they had first received funds therefor from the Dannerbecks' joint trust account, he filed a motion challenging the plenary jurisdiction of the district court and asking that the matter be remanded to the bankruptcy court.[11] An additional circumstance relied upon by the trustee in making this argument is that both the Dannerbecks and Palmer had filed claims in the bankruptcy court thereby, the trustee asserts, consenting to its jurisdiction.[12]

The trustee argues that his consent to be joined in this action when filed by the sureties did not carry over to Mrs. Dannerbeck and that the jurisdiction of the bankruptcy court is exclusive as related to the Dannerbeck and Palmer claims. The trustee calls attention to

Pepper v. Litton, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939), where it was held that in the allowance and disallowance of claims, the collection and distribution of the estates of bankrupts, the determination of controversies in relation thereto, and in the rejection in whole or in part of claims previously allowed, the jurisdiction of the bankruptcy court is exclusive.

The *Litton* court was speaking of the administration of bankrupt estates. The proceeds of the contracts here in question were never in the actual or constructive possession of the bankruptcy court because those proceeds were never earned by the bankrupt. This action does not involve the priority of claims filed against a bankrupt's estate, but the title to funds which are not in the possession of the bankruptcy court. Neither Mrs. Dannerbeck nor Palmer consented to having the title to this property tried in the bankruptcy court. As Mrs. Dannerbeck and Palmer point out, the rule to be applied under these circumstances is as stated in Cline v. Kaplan, 323 U.S. 97 at 99, 65 S.Ct. 155, 156, 89 L.Ed. 97 (1944):

> "If the property is not in the [bankruptcy] court's possession and a third person asserts a *bona fide* claim adverse to the receiver or trustee in bankruptcy, he has the right to have the merits of his claim adjudicated 'in suits of the ordinary character with the rights and remedies incident thereto.'"

The claims which Mrs. Dannerbeck and Palmer filed in the bankruptcy

---

11. Actually, the motion the trustee first filed upon discovering the manner in which the claims had been paid, was an objection to the prosecution of the action by the surety companies, coupled with a motion, in the alternative, to dismiss the complaint on the ground that Mrs. Dannerbeck was the real party in interest, in the event a proper substitution of parties was not made. In that motion the trustee made no contention that exclusive jurisdiction rested in the bankruptcy court. Mrs. Dannerbeck was substituted as the party plaintiff on August 8, 1969, and it was not until September 14, 1971, that

the trustee requested, as an alternative to deciding the case on the merits in favor of the trustee, that the matter be remanded to the bankruptcy court for final disposition. Again, there was no contention that the bankruptcy court had exclusive jurisdiction and, in fact, the trustee himself expressed a willingness to have the plenary action proceed, providing that he prevailed.

12. In support of this latter proposition, the trustee cites In re Muntz T.V., Inc., 225 F. 2d 493 (7th Cir. 1955); In re Barnett, 12 F.2d 73 (2d Cir. 1926); Britton v. Western Iowa Co., 9 F.2d 488 (8th Cir. 1925).

court were merely contingent claims for amounts due that might not be recovered in the plenary action. The filing of contingent claims of this kind does not amount to a consent to have the bankruptcy court determine the title to property not in its actual or constructive possession. *See* In re G. L. Odell Construction Co., 119 F.Supp. 578, 581 (D. Colo.1954).

In our opinion, the district court had plenary jurisdiction to entertain this action.

Affirmed.