In re CAROLEE'S COMBINE, INC., Bankrupt.

E. Penn NICHOLSON, Trustee, Plaintiff,

v.

Jay CORE, Defendant.

Bankruptcy No. B77–268A.

United States Bankruptcy Court,
N. D. Georgia,
Atlanta Division.

March 31, 1980.

Paul W. Bonapfel, Atlanta, Ga., for plaintiff.

Robert S. Gunter, Little Rock, Ark., for defendant.

**325**

## ORDER

HUGH ROBINSON, Bankruptcy Judge.

This case arises out of a no-minimum, no-reserve auction venture conducted by the bankrupt Carolee's Combine, Inc., in Atlanta, Georgia, on October 8 and 9, 1976. The auction failed, grossing only $625,-000.00 against liabilities of $850,000.00. Because the only assets of the bankrupt were the items sold at the auction, it was insolvent both before and after the auction.

Included in the bankrupt's debt of $850,-000.00 were obligations to individuals and entities providing the seed money for the venture. The first question in this case is whether the defendant's advance of $1,500.00 was an investment of an equity nature such that the repayment to him must be returned to the estate and subordinated to the claims of other creditors. The Trustee also seeks return of transfers totalling $15,931.00 on the ground that they were preferences voidable under section 60 of the Bankruptcy Act. After hearing evidence at a trial regularly scheduled and noticed by the clerk of this court, the Court finds the facts and makes its conclusions of law as follows.

Carolee's Combine, Inc., was organized by Carolee W. Davies as a Georgia corporation for the purpose of conducting an auction of architectural antiques in Atlanta, Georgia, on October 8 and 9, 1976. The corporation planned to acquire architectural antique merchandise (generally old building materials and fixtures such as columns, staircases, railings, bars, chandeliers, windows, and the like which are suitable for incorporation into other structures), either by purchase or consignment, transport the items to Atlanta, Georgia, for restoration and refinishing, and then sell the merchandise at a no-minimum, no-reserve auction. Because Carolee Davies, the sole officer and shareholder of the bankrupt, contributed little capital, if any, to the auction venture, and because the venture could not raise substantial amounts of cash through more conventional means, it was necessary to overcome the problem of incurring substantial expense to acquire, transport and refurbish inventory, all be-

fore the proceeds from the auction sale would provide the only cash flow. In particular, the bankrupt needed cash to acquire merchandise because "point sources"—the persons in the architectural antique industry engaged in locating and salvaging merchandise from old buildings and selling it to be auctioned—normally insisted on cash payment. To solve this problem, the bankrupt used two procedures employed at least twice previously by other auction companies in which Carolee Davies and her husband, R.D. Davies, were involved: to wit, an inventive money raising scheme and maximum possible deferral of all obligations.

Between May 7, 1976, and October 4, 1976, Carolee Davies and her husband, R.D. Davies, raised $329,050.00 by promising the persons and entities who advanced such money, in writing, that on the first day of the two-day auction the amount advanced would be returned with ten percent annual interest, and that a bonus in the amount of a flat ten percent of the principal amount of the advance (styled a "Finder's Fee") would be paid at the same time. These obligations were evidenced by two documents, one styled a "Promissory Note" and the other a "Finder's Fee" letter. This device had been used to raise money for the previous auctions conducted by Carolee Davies through Carolee's Architectural Combine, Inc., a California corporation which had held an auction earlier in 1976 in Los Angeles, California, and the Golden Movement Emporium, an auction company owned by John Wilson and R.D. Davies in which Carolee Davies had been involved. Many of the 23 investors from whom the $329,050.00 was raised by the bankrupt had made similar investments in these prior ventures. The net effect of the arrangement was to provide for repayment of the investors from initial cash flow at the auction, thereby transferring the risk of loss and insolvency to the general creditors.

As part of the overall plan, Carolee's Combine, Inc. deferred as many as possible of its obligations for labor, materials, rent, and utilities until after the auction. Thus, laborers were sought who would work as "subcontractors" (thereby eliminating state and federal unemployment and withholding taxes) and who would agree to wait for payment at least in large part until the conclusion of the auction. Likewise, many suppliers of other goods and services were convinced to wait for payment until after the auction—or given post-dated checks. In addition, a few sellers of merchandise agreed to accept post-dated checks, and rent and utilities in the amount of $3,953.13 were deferred. The "floating" of these obligations allowed the bankrupt to decrease its operating expenses, thereby maximizing the purchase of merchandise with the money acquired through the fund-raising contracts.

As a result of these procedures, the bankrupt arrived at the day of the auction insolvent, having obligations of $363,623.97 to the investors on the contracts described above, an obligation of $35,561.35 to the First National Bank of Atlanta, and owing $268,940.15 to trade creditors, laborers, and others. Moreover, at the auction's conclusion, an additional $184,284.30 was owed to consignors as their 60 percent share (after deduction of expenses) of the proceeds from the sale of their merchandise. These obligations total $852,409.77. Since the auction proceeds were only $624,469.00, and since the other assets amounted to only $32,-368.84, the auction failed to break even by $195,570.93.

Despite this substantial shortfall, $313,-764.32 was returned to investors in advance of other creditors who received nothing. This result was assured by the fact that on October 7, 1976, the day before the auction, the bankrupt wrote checks totalling $363,-623.97 for delivery to investors on the first day of the auction, October 8, 1976. The bankrupt began that day with an overdraft of $326.44 in its only bank account.

■ Defendant was one of the persons who received his check at the auction and was repaid his investment. The Trustee contends that this transfer represented a return on an investment of an equity nature such that it was not entitled to be paid in priority to general creditors and that it

should be returned for distribution in accordance with the Bankruptcy Act. In this regard, the Trustee contends further that it should be subordinated to the claims of unsecured creditors. This Court agrees.

The evidence in this case establishes that the monies advanced pursuant to the investment contracts described above provided the "seed money" for the bankrupt's auction enterprise and constituted virtually all of its capital. The evidence also established that the extra flat ten percent "Finder's Fee" was not a finder's fee at all, since in the commercial context a finder's fee is normally paid (1) to a third party other than the lender (2) at the time the loan is arranged. Neither of these facts is present with regard to the purported "Finder's Fee" arrangement in these contracts, providing compelling evidence that the characterization of the obligation as a "Finder's Fee" was using a euphemism to disguise what, in economic terms, was an agreed return on risk capital. The fact that the advances were risk capital or "seed money" is further evidenced by the high return which on an annual basis ranged from 60 percent to over 520 percent. Such returns are generally associated only with equity positions in investments such as stock or fixed assets, and not debt instruments; for example, during this same period of time, the bankrupt was able to obtain loans from the First National Bank of Atlanta at an interest rate of only ten percent. Further, while the return on a debt obligation increases with the risk, the guaranteed payment from initial cash flow of the corporation's auction sale clearly shifted the risk away and belies the debt nature of the obligation; in other words, the high rate of return cannot be justified as being consistent with a debt obligation on the basis of risk because, as a practical matter, there was little risk.

Based on the foregoing analysis of the investments, this Court concludes that the defendant's advance of money was an investment of an equity nature and its return must be postponed until general obligations of the bankrupt are paid. Consequently, the defendant herein must return the $1,500.00 transfer and the Trustee is entitled to a judgment in that amount.

■■■ The Trustee's ability to recover this transfer stems from two independent sources. First, it is clear that this Court, as a court of bankruptcy and equity, has the power to subordinate the claim of one creditor to the claims of other creditors "where subordination is necessary to prevent the consummation of conduct which is inequitable." *Central States Corp. v. Luther*, 215 F.2d 38 (10th Cir. 1954). It is well established under *Pepper v. Litton*, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939), that obligations of a bankrupt which, under state law, are "loans" may nevertheless be treated as capital contributions for purposes of the Bankruptcy Act and the rights of the holders of such loans subordinated to the claims of general creditors. In this case, therefore, it is plain that, if the defendant had never been paid on his investment any claim with regard to that investment would, under the analysis set forth above, be subordinated to the claims of general creditors. Similarly, the principle of equitable subordination requires persons who are paid be placed in the same position as persons who are not paid. Accordingly, if equitable subordination is proper, the fact that the defendant was paid does not prevent this Court from subordinating his claim against the bankrupt and, as a necessary corollary to that subordination, requiring him to return that which he has received.

■■ The most recent discussion of equitable subordination in this circuit is *In re Mobile Steel Co.*, 563 F.2d 692 (5th Cir. 1977), where the Court set forth three standards which must be met for equitable subordination to be appropriate. They are (1) the subordinated creditor must have engaged in some type of inequitable conduct; (2) such conduct must have resulted in injury to other creditors of the bankrupt or conferred an unfair advantage on the subordinated creditor; and (3) equitable subordination must not be inconsistent with the provisions of the Bankruptcy Act.

The Trustee has met his burden of proof on all of these issues. The conduct of defendant, like the other investors, was clearly inequitable since the provisions of their contracts for prior payment injured trade creditors and conferred an unconscionable advantage on them in exchange for which they were promised and received an extraordinarily high return. These investors advanced monies to a speculative venture for the promise of a high return (certainly not in itself inequitable) but shifted the risk of that speculation to general creditors by arranging to be paid in advance. In essence, the investors shifted the risks, normally associated with "seed money" investments which yield the high returns they were seeking, to trade creditors. In essence, they secured a secret first claim on the assets of the corporation. Consistent with the Bankruptcy Act, this Court's equity powers are properly invoked to avoid this result.

Since for the reasons discussed above the defendant's participation in the bankrupt's auction enterprise must properly be viewed as a proprietary interest, there is another theory supporting the Trustee's claim. As an ownership interest, the defendant's claim comes within the definition of a "share" under Georgia corporate law, which defines shares as "units into which the proprietary interests in a corporation are divided." *Ga.Code Ann.* § 22–102(e). Clearly, one cannot withdraw capital from a corporation without first arranging for the payment of its valid debts, *Ga.Code Ann.* § 22–512(a). Since the transfer amounts to a voidable conveyance under Georgia law, the Trustee is entitled to recover it under Section 70e of the Bankruptcy Act.

In summary, therefore, the Trustee is entitled to judgment in the amount of $1,500.00 plus interest at the statutory rate of 7% from the date of the transfer.

In addition to the investment transaction referred to above, defendant was a consignor and "subcontractor" who, at the end of the auction, was owed $15,158.43 for expenses and services he supplied and $14,-739.65 as his share of the proceeds of goods he consigned for a total of $29,898.08. On October 17, 1976, auction personnel held a meeting with several consignors, including defendant, at which Carolee Davies, president of the bankrupt, announced that the auction had only enough money to pay each of the consignors about one-half of what they were owed. Thereafter, defendant received $5,931.00 in cash on October 20; $1,000.00 in cash on October 21; and a $9,000.00 check, dated October 21, which was paid on October 22. The Trustee contends that he is entitled to recover these transfers, in the total amount of $15,931.00, as a preference voidable under Section 60 of the Bankruptcy Act.

The Trustee has shown all elements of a preference, as defined in Section 60a of the Bankruptcy Act, in that the bankrupt transferred property to the defendant, who was a creditor, for or on account of an antecedent debt, within four months of a filing of a petition against it.[1] Since defendant was a general creditor, and numerous other general creditors received nothing, he necessarily received a greater percentage of his debt than others of the same class. Accordingly, defendant received a preference within the meaning of Section 60a.

Under Section 60b of the Bankruptcy Act, a preference under Section 60a is voidable only if the transferee had "reasonable cause to believe that the debtor is insolvent" at the time of the transfer. Defendant had "reasonable cause to believe" that the debtor was insolvent from two sources. First, he was at the meeting at which it was announced that the auction could not pay all of its debts; a direct admission that the bankrupt was insolvent. Second, he attended the auction at which it was apparent that prices for merchandise were substantially lower than had been anticipated. Since defendant knew or should have

---

1. Defendant became a general creditor with regard to the amount due him on his consignment when the proceeds from the sale of his merchandise were deposited in the general account of the bankrupt following the auction, without any segregation of funds.

known that the proceeds from the auction would constitute the sole source from which all obligations of the bankrupt would have to be paid, the low prices were a clear warning that the enterprise was in trouble; further, an inquiry to auction personnel on Saturday night would have revealed the true situation of the bankrupt, since at that time it was known that the auction had grossed only $625,000.00 while having obligations known by the bankrupt prior to the auction to exceed $800,000.00.

Accordingly, the Court finds that the defendant received a transfer voidable under Section 60 of the Bankruptcy Act, and the Trustee is entitled to a judgment in the amount of $15,931.00. In addition, the Trustee is entitled to interest computed at the statutory rate from the date of the filing of his objection to the defendant's claim.

Finally, under Section 57g of the Bankruptcy Act, the Trustee is entitled to a judgment disallowing the defendant's claim until the amount of the transfers which he is entitled to recover are returned to the estate.

The foregoing constitutes the Court's Findings of Fact and Conclusions of Law as required by Rule 752 of the Rules of Bankruptcy Procedure.

## JUDGMENT

This action came on for trial before the Court, the Honorable Hugh Robinson, United States Bankruptcy Judge, presiding, and the issues having been duly tried, and a decision having been duly rendered,

IT IS ORDERED AND ADJUDGED

That the plaintiff, E. Penn Nicholson, Trustee, recover of the defendant Jay Core the sum of $1,500.00, with interest thereon at the rate of 7% per annum from October 11, 1976;

That the plaintiff, E. Penn Nicholson, Trustee, recover of the defendant Jay Core the sum of $15,931.00, together with interest thereon at the rate of 7% per annum from October 6, 1978;

That the plaintiff E. Penn Nicholson, Trustee, recover all costs of this action;

That the claim of defendant filed herein in the amount of $13,967.08, be disallowed unless and until this judgment is satisfied.