In re N & D PROPERTIES, INC., d/b/a the Sofa Galleries on Paces, Debtor.

Julia Schou ESTES, Plaintiff/Appellee/Cross-Appellant,

v.

David W. CRANSHAW, Chapter 7 Trustee for N & D Properties, Inc., d/b/a the Sofa Galleries on Paces, Defendant/Appellant/Cross-Appellee.

Bankruptcy No. 83–03501A.
Civ. A. No. C85–2226A.

United States District Court,
N.D. Georgia,
Atlanta Division.

Sept. 30, 1985.

Nolan B. Harmon, Harmon, Smith & Bridges, Atlanta, Ga., for plaintiff/appellee/cross-appellant.

Peter J. Quist, Steven K. Bender, Robert A. Bartlett, Hicks, Maloof & Campbell, Atlanta, Ga., for defendant/appellant/cross-appellee.

## ORDER

FORRESTER, District Judge.

This appeal from a final judgment of the United States Bankruptcy Court for the Northern District of Georgia is before this court pursuant to 28 USC § 158. The appellant in this case is the trustee appointed to oversee the debtor corporation's Chapter 7 liquidation proceeding. The appellee and cross-appellant is Mrs. Julia Estes, a claimant against the estate of the debtor corporation. Both parties to this appeal have moved for leave to exceed this court's page limitations for briefs. In view of the complexity of this case and the parties' good faith compliance with the requirements of Bankruptcy Rule 8010, leave to exceed page limitations imposed by this court with respect to the briefs already filed by the parties is GRANTED.

In reviewing the decision of the bankruptcy court, this court is mindful that the bankruptcy court's "[f]indings of fact should not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses." Bankruptcy Rule 8013.[1] Of course, this

---

1. Some courts have indicated that unconstitutionality of the "clearly erroneous" standard follows inexorably from the holding in *Northern Pipeline Construction Co. v. Marathon Pipeline Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), *see 1616 Reminc Limited Partnership v. Atchison & Keller Co.*, 704 F.2d 1313, 1316–18 (4th Cir.1983). However, this circuit continues to adhere to the standard. *Chalik v. Moorefield (In Re Chalik)*, 748 F.2d 616, 619 (11th Cir.1984).

court may make a *de novo* review of the bankruptcy court's conclusions of law. *Borg-Warner Acceptance Corp. v. Fedders Federal Corp. (In Re: Hammons)*, 614 F.2d 399, 403 (5th Cir.1980).

## I. FINDINGS OF FACT.

After a four and one-half day hearing, consisting of seventeen witnesses and the presentation of 616 exhibits, the bankruptcy court made eighty separate findings of fact regarding the events and transactions involving Mrs. Estes' claim against the debtor corporation's estate. Having reviewed the transcript of this hearing and considered the evidence before the bankruptcy court, this court cannot conclude that the findings of fact were clearly erroneous. The findings of fact of the bankruptcy court are hereby adopted and incorporated by reference. Although reference to the order of the court below would give a complete understanding of the facts which this court takes to be true, those facts which are central to the legal issues in this appeal are summarized as follows.

The debtor corporation, N & D Properties, Inc., was formed on November 30, 1979 by James H. Dowis. N & D Properties did business as Sofa Galleries on Paces, a furniture store which N & D Properties agreed to manage for AGAPE, Inc. When Dowis initially formed N & D Properties he looked to the claimant, Mrs. Julia Estes, for assistance in financing the venture. Dowis was a long-time family friend of the Estes and had been the family accountant for ten to fifteen years prior to the formation of N & D Properties.

In February of 1980 Mrs. Estes agreed to make a $40,000 loan to N & D Properties. She understood that she would receive interest on her loan in the amount of three percent of the monthly sales of the furniture store and that she would recover the principal amount when "the store got on its feet." Over the life of the corporation she received approximately $22,421 in such interest payments. The principal amount was never repaid.

In October of 1980 plaintiff pledged to First National Bank of Gwinnett (FNBG) four bonds worth $25,000 each to secure a loan from FNBG to N & D Properties in the amount of $60,010.50. Plaintiff received 450 shares of common stock of the debtor corporation as well as a $25,000 personal loan for the construction of a swimming pool in consideration for having pledged her bonds to FNBG. This transaction made Mrs. Estes an owner of forty-five percent of the outstanding shares of the debtor corporation. Mrs. Estes subsequently repaid the swimming pool loan in full on September 24, 1982.

Dowis approached Mrs. Estes in the spring of 1981 requesting stock pledges for the benefit of the debtor corporation so that its volume of furniture could be expanded.[2] Mrs. Estes agreed to hypothe-

---

The viability of the "clearly erroneous" standard is particularly evident in light of the fact that Bankruptcy Rule 8013 was promulgated by the Supreme Court on April 25, 1983, nearly a year after the *Marathon Pipeline* decision. In any event, because the *Marathon Pipeline* decision only found that there was constitutional infirmity in allowing related matters to be determined by a tribunal not established in accordance with Article III, this court has no doubt that the "clearly erroneous" standard is by itself constitutional. *See In Re Shop-N-Go of Maine, Inc.*, 38 B.R. 731, 734 (D.Maine 1984).

2. Mrs. Estes testified that she was willing to make money available for Dowis' operation on the strength of his representations that all the business needed was increased volume:

Q: Now, Mrs. Estes, let me ask you this, I know you testified that you did these things, you gave him these bonds to use as collateral and you would put money in this furniture store in return for interest. Why did you do that? Why would you do that?

. . . .

A: I would loan this money to Jim for the furniture business because he kept telling me we needed to increase the volume of the store.

Q: Well, did you believe him or not?

A: Yes, I believed him. He always told me it was doing fine and growing. We just had to have more stock, more furniture, to make a go of the store.

Q: Well, did you have any reason to distrust him?

A: Never. No. Jim, he always did a lot for us. He was our accountant and our tax man.

Tr. V. II, pp. 9–10.

cate shares of American Brands, Inc. stock in favor of N & D Properties as collateral for a loan with First National Bank of Cobb (FNBC). She executed a hypothecation certificate on April 28, 1981 covering 500 shares of her American Brands stock and simultaneously co-signed a promissory note for a loan to N & D Properties in the amount of $25,000. On June 12, 1981 this promissory note was renewed and the principal amount of the loan was increased to $46,200. Mrs. Estes also co-signed this second promissory note.

Mrs. Estes received a copy of a demand letter on July 29, 1981 from FNBG stating that N & D Properties was in default on the payment of notes secured by her pledge of bonds in October of 1980. In an apparent effort to refinance the FNBG loan, plaintiff agreed to execute a new hypothecation certificate in favor of N & D Properties with FNBC. On August 13, 1981 she hypothecated an additional 3,694 shares of American Brands stock and contemporaneously co-signed a promissory note for a loan to N & D Properties in the amount of $87,000. A portion of this additional amount acquired from FNBC was used to pay the FNBG loans. Mrs. Estes received the four bonds held by FNBG as collateral upon repayment of the FNBG loan. The remainder of the money acquired as a result of the August 13, 1981 transaction was used to pay back Mrs. Estes for a short-term loan of $8,000 apparently made to N & D Properties earlier in August of 1981.

In addition to the collateral represented by the stock hypothecated by Mrs. Estes, FNBC acquired a security interest in the debtor corporation's inventory by virtue of a security agreement executed on September 30, 1981. This security interest was perfected by the filing of a UCC financial statement. On the strength of Mrs. Estes' American Brands stock and the subsequent security agreement, FNBC renewed the initial promissory notes referred to above and extended further loan amounts and credit to the debtor corporation between September of 1981 and July of 1983. Mrs. Estes participated in the renewal of the initial promissory notes, as well as the extension of further credit to the debtor corporation. N & D Properties eventually amassed an indebtedness to FNBC of $191,669.11.

In April of 1983 Mrs. Estes learned from her husband that there was "big trouble" with the FNBC loans and that her stock might be sold to satisfy the debtor corporation's debt. Mrs. Estes received a copy of a demand letter to N & D Properties from FNBC on June 23, 1983 outlining default by N & D Properties in the repayment of $191,669.11. Mrs. Estes hired an attorney who negotiated an extension of time before the sale of her stock by FNBC. Mrs. Estes' attorney commissioned a study of the finances of the debtor corporation by a retail business consultant who concluded on July 18, 1983 that the business was insolvent. On that same day FNBC sold the American Brands stock which had secured the obligations previously outlined and returned the excess of $79,692.61 realized from the liquidation of the stock to Mrs. Estes. On July 21, 1983 FNBC executed an assignment to Mrs. Estes of the promissory note which the liquidation of her stock satisfied, and of the security agreement and financing statement representing the security interest which FNBC had acquired in the debtor corporation's inventory.

On July 22, 1983 plaintiff made a secured loan to the debtor corporation for the purpose of allowing it to file for Chapter 11 bankruptcy. The loan was in the amount of $1,200. On July 29, 1983 N & D Properties elected plaintiff as secretary for the purpose of filing a Chapter 11 bankruptcy petition. On August 2, 1983 N & D Properties filed a Chapter 11 petition and Mrs. Estes resigned as secretary. The present action was commenced on August 17, 1983 when Mrs. Estes filed a motion for relief of stay or adequate protection, seeking to foreclose on the security interests which she acquired from FNBC and as a result of the loan she made to the debtor corporation enabling it to petition for bankruptcy. Because N & D Properties converted the bankruptcy proceeding from a Chapter 11

corporate reorganization to a Chapter 7 liquidation proceeding, Mrs. Estes re-filed her motion as an adversary complaint on September 8, 1983 seeking recovery of the money held by the trustee as a result of Chapter 7 liquidation. The trustee responded to plaintiff's complaint, and following a hearing a decision was rendered by the bankruptcy court from which both parties appealed.

It is unclear what precipitated the demise of the debtor corporation. Dowis has noted that the debtor corporation struggled financially as a new business suffering from slow furniture sales during a recessionary period. Tr. V. IV, p. 53. It is disputed whether initial undercapitalization contributed to the eventual bankruptcy of the debtor corporation. The bankruptcy court made no findings regarding undercapitalization, but a review of the record reveals that pursuant to its initial agreement with AGAPE, Inc., to manage its furniture business $30,000 was raised as initial capital. Tr. V. IV, pp. 44–54 (Dowis). It is disputed whether this money, contributed by three friends of Dowis who were originally listed as officers of the corporation, constituted loans or outright capital contributions. *Id.* Expert testimony on behalf of the trustee revealed that if this initial $30,000 were considered paid-in capital, then it would be adequate capitalization for the limited business which N & D Properties initially transacted pursuant to their contract with AGAPE, Inc. Tr. V. III, p. 88. On the other hand, the evidence also reveals that N & D Properties had a negative net worth which increased from $41,223.52 on August 31, 1980 to a negative net worth of over $431,207.00 on August 2, 1983, the date of filing of the Chapter 11 bankruptcy petition in this proceeding. *See* Defendant's Exhibit 515. It is unclear whether this increase in negative net worth was due to the fact that N & D Properties was primarily financed by loans or whether it was due to questionable disbursements from N & D Properties approved by Mr. Dowis.

After examining the financial records of the debtor corporation, the trustee's expert testified that some $613,000 worth of checks drawn on the debtor corporation's account were of questionable relevancy to the corporation's business. Tr.V. III, p. 154. Among the questionable expenses identified by the trustee's expert were checks written to Dowis family members, checks made out to cash signed by James Dowis, checks made payable to Teaselwood Farms owned by Dowis, and checks for various personal expenses as follows: Bicycle and moped rental, radial tires, jewelry, clothes, sporting goods, automobile expenses, including an $18,000 Porsche automobile, mortgage payments, and other miscellaneous expenses. *Id.* at 164–68. In addition to checks written by James Dowis for personal matters, some thirty-eight checks amounting to $222,500.00 were written to the Crowley Corporation by Mr. Dowis. All of these checks allegedly represented repayment to Crowley Corporation of funds which had been advanced by Crowley to N & D Properties, but records of the corporation did not substantiate initial receipt of such funds by the debtor corporation. The trustee's expert testified that "[t]o the extent that these funds were not advanced by Crowley or to the extent that they were advanced to Mr. Dowis and were repaid by N & D, this would be a part of the funds that moved outside the corporate shell." *Id.* at 169. The significance of all of these questionable disbursements is highlighted by testimony by the trustee's expert that if these expenditures of Mr. Dowis were considered receivables of the debtor corporation, the debtor corporation would not be insolvent. *Id.* at 177–81. In sum, the unfortunate failure of N & D Properties must be said to have resulted from the combination of factors including a lack of paid-in capital and questionable use of funds by Mr. Dowis.

It is clear that Mrs. Estes was ignorant of the vital facts regarding the financing of N & D Properties during her association with the corporation. The bankruptcy court found that she,

is a woman of little business experience, no business education, and from the tes-

timony at trial, little business judgment. She was not a founder of the corporation although she ultimately became a significant minority shareholder. She did not receive internal financial statements regarding the corporation, nor would she have understood them.

Record at 41. She was a minority, non-controlling shareholder of the debtor corporation.[3] Mrs. Estes never served as the director of the corporation and only visited this store on two or three occasions. Tr.V. IV, p. 107 (Dowis). Although Mrs. Estes received tax benefits as a result of losses suffered by N & D Properties from 1980 until 1982, the bankruptcy court concluded that she did not read the income statements prepared by Dowis for her before they were filed with the government. In sum, her knowledge of the corporate affairs and the financial status of N & D Properties was minimal. She relied heavily upon Mr. Dowis to judge the necessity of further loans by her and to take care of her interests in the debtor corporation.

## II. DECISION OF THE BANKRUPTCY COURT.

The bankruptcy court recognized that Mrs. Estes had a claim in the amount of $192,869.11 representing her position as a co-debtor who had succeeded to the position of the creditor FNBC and representing her secured loan to the debtor corporation of $1,200.00. However, the court reduced the amount of Mrs. Estes' claim by $60,010.50 representing the portion of the FNBC loan which was used to refinance the original FNBG loan. The court reasoned that the original FNBG loan was in reality a capital contribution in light of the fact that Mrs. Estes received 450 shares of common stock in return for pledging her bonds to make possible the FNBG loan. The bankruptcy court essentially characterized the $60,010.50, which was loaned to N & D Properties, refinanced by the FNBC loan and paid off by liquidation of Mrs. Estes' stock, as a capital contribution. This was a straightforward determination that in this particular instance Mrs. Estes took an equity position when she advanced funds to the debtor corporation. By re-characterizing this portion of her claim as a capital contribution, the bankruptcy court apparently meant to place her $60,010.50 claim at the end of the distribution process under the Chapter 7 liquidation. Therefore, Mrs. Estes would receive property of the debtor corporation's estate in satisfaction of this claim as a part owner of the debtor. See 11 USC § 726(a)(6) (distribution of property goes last "to the debtor").

In addition to re-characterizing a portion of Mrs. Estes' claim, the bankruptcy court exercised its powers of equitable subordination with regard to Mrs. Estes' remaining secured claim for $132,858.61. In particular, the bankruptcy court exercised the equitable powers granted to it by 11 USC § 510(c) when it concluded that Mrs. Estes' inequitable conduct justified subordinating her secured claim to the claims of all other creditors. The inequitable conduct identified by the court in its original opinion was the procuring of a security interest by Mrs. Estes after liquidation of her American Brands stock by FNBC. Relying upon the decision of *In Re Multiponics, Inc.*, 622 F.2d 709 (5th Cir.1980), the court concluded that Mrs. Estes had breached her duty of good faith and fair dealing as a fiduciary of the corporation when she procured a security interest she had previously neglected to obtain for no additional consideration. Record at 30. When Mrs. Estes pointed out that she had the legal right to become subrogated to the rights of FNBC, *see* O.C. G.A. § 10–7–56, the bankruptcy court decided in its reconsideration opinion that the assignment of the security interest was itself inequitable. The court concluded as follows:

> Because plaintiff failed to obtain a security interest from N & D in consideration for a pledge of collateral, the creditors were not put on notice that there were two entities with a security interest in the debtor's inventory rather than just

---

3. Mr. Dowis held controlling interest of 500 of the 1,000 outstanding shares of N & D Proper-

ties, Inc., while Mrs. Estes held only 450 shares of the corporation. Tr. V. IV, p. 70.

one. Moreover, if plaintiff had sought a security interest as a condition for her pledge, FNBC could not have taken a first security interest in the debtor corporation's inventory. Under such circumstances FNBC could have chosen either to loan less money on the collateral and take a second security interest or to seek from plaintiff a subordination of her first security interest to that of FNBC. Either event would have more accurately reflected the reality of interest between plaintiff, N & D, and FNBC, and the creditors would have been protected by this more accurate reflection. If FNBC had extended less credit, the business life of N & D would have been shortened. Record at 57.

In bolstering its decision that Mrs. Estes' claim was subject to equitable subordination, the bankruptcy court also pointed to other instances of inequitable conduct. For example, the court noted that financial statements prepared by Mr. Dowis listed the debtor corporation as owner of the American Brands stock which Mrs. Estes actually owned and had merely pledged for the benefit of N & D Properties. Aside from this misrepresentation which the court did not conclude was made with the knowledge or participation of Mrs. Estes, the court noted that Mrs. Estes was aware of the debtor corporation's financial problems based on the fact that she owned a forty-five percent interest in the corporation. Additionally, she was alerted to the debtor corporation's financial problems when it defaulted on its loan to FNBG. Finally, the court noted that her ignorance of the tax losses from which she had benefited from was not excusable. Record at 58. A last example of Mrs. Estes' inequitable conduct was the swimming pool loan which N & D Properties made to her and on which she never paid any interest. Record at 59. For all of these reasons, the court found that Mrs. Estes had acted inequitably, breached her fiduciary duties to the corporation, gained an unfair advantage over other creditors, and caused injury to other creditors of the debtor corporation.

While the court was willing to subordinate Mrs. Estes' claims, it was not willing to hold her liable for transfers of money from N & D Properties to such entities as Teaselwood Farms. Record at 43–44. More importantly, the court concluded that Mrs. Estes was not liable for fraudulent transfers under either state law or bankruptcy law as a result of having received payments from N & D Properties. The court concluded that these payments were in the form of interest income to Mrs. Estes for an antecedent debt of the debtor corporation. Record at 44. Furthermore, the court concluded that Mrs. Estes was not liable for preferential transfers under the bankruptcy code. The money which Mrs. Estes received in the form of interest payments between ninety days and one year before the date of filing of the petition of bankruptcy were not considered preferential transfers in light of the fact that the court earlier concluded that Mrs. Estes was not "an insider" at the time of such transfers. Record at 45 (citing 11 USC § 547(b)(4)(B)). With regard to transfers made within ninety days before the filing of the bankruptcy petition, the court noted there were no transfers which the trustee could avoid as preferential. The $79,692.61 which Mrs. Estes received representing the excess after her American Brands stock was liquidated could not be considered a preferential transfer in light of the court's conclusion that the stock itself was always the property of Mrs. Estes rather than the property of the debtor corporation. The payment of the debtor corporation's $191,-667.11 debt to FNBC could not be considered a preferential transfer in light of the "well established law that there is not preference when a holder of a guarantee is paid by the guarantor notwithstanding the bankruptcy of the party whose performance is guaranteed." Record at 45 (citing *Boltd v. Alpha Beta Co. (In Re Price Chopper Supermarkets, Inc.)*, 40 B.R. 816, 819 (Bankr.N.D.Cal.1984)). Finally, the court noted that the acquisition of a security interest in return for her $1200 loan made on July 26, 1983 to N & D Properties

for the purpose of financing the petition for bankruptcy could not be considered a preferential transfer because it was a contemporaneous exchange for new value given to the debtor. Record at 46 (citing 11 USC § 547(c)).

## III. CONCLUSIONS OF LAW.

### A. *Calculation of Mrs. Estes' Secured Claim.*

The bankruptcy court initially recognized that Mrs. Estes had a secured claim in the amount of $192,869.11 representing the FNBC transaction resulting in her secured claim of $191,669.11, plus her pre-bankruptcy petition secured loan of $1,200.

■ Mrs. Estes challenges the disallowance of $60,010.50 of her secured claim on the basis that this represented a capital contribution rather than a *bona fide* loan. Mrs. Estes argues that "[t]he testimony and documentation clearly reflect that [this] was a loan under the express understanding of the parties but also as a matter of fact under applicable law." "Brief of Cross-Appellant, Julia S. Estes," at 18. This argument is not convincing. If a claim is in actuality an assertion of an equity interest in the debtor corporation, then the bankruptcy court is obliged to place that claim behind those representing *bona fide* loans to the debtor corporation. *See* 11 USC § 726. The evidence clearly supported the bankruptcy court's finding that Mrs. Estes received forty-five percent stock ownership in the corporation as a result of pledging bonds to FNBG to secure a loan from FNBG to N & D Properties. For example, a memorandum written by Mr. Dowis to Mrs. Estes states that "[t]his ownership comes from pledging the four $25,000 notes to N & D Properties, Inc. to be used as collateral on loans to N & D Properties, Inc....." Defendant's Exhibit 106. When the FNBG loan was refinanced by the FNBC loan and Mrs. Estes' stock was subsequently liquidated to satisfy the FNBC loan, the capital contribution recognized by the bankruptcy court was made complete. This court will not upset the sound judgment of the lower court that

Mrs. Estes took an equity position when she effectively loaned $60,010.50 to N & D Properties in return for 450 shares of common stock. Having concluded that Mrs. Estes' secured claim was properly reduced to $138,858.61, the court must consider the equitable subordination of her secured claim.

### B. *Equitable Subordination of Mrs. Estes' Secured Claim.*

Courts are authorized by 11 USC § 510(c)(1) to, "under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest...." This provision is the codification of well-established law that a bankruptcy court has the authority to subordinate claims on equitable grounds. *See Pepper v. Litton,* 308 U.S. 295, 306, 60 S.Ct. 238, 245, 84 L.Ed. 281 (1939). The Supreme Court recognized that because directors as well as dominant or controlling shareholders have fiduciary duties toward the corporation and its creditors, their dealings with the corporation are subjected to rigorous scrutiny and such fiduciaries must establish the good faith and inherent fairness of any of their transactions with the corporation. The trustee acts in bankruptcy to enforce the fiduciary obligations of directors and dominant or controlling shareholders. *Id.* at 306–07, 60 S.Ct. at 245.

■ The proper test of whether equity should operate to subordinate a claim is:

(i) The claimant must have engaged in some type of inequitable conduct.

(ii) This conduct must have resulted in injury to the creditors of the bankrupt or conferred to unfair advantage on the claimant.

(iii) Equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Act.

*Benjamin v. Diamond (In Re Mobile Steel Co.),* 563 F.2d 692, 700 (5th Cir.1977) (citations omitted).

A review of the allegedly inequitable actions taken by Mrs. Estes reveals that the bankruptcy court was in error when it subordinated Mrs. Estes' secured claim.

### (i) Assignment of Security Interest

■ The bankruptcy court relied upon assignment of FNBC's security interest as evidence of inequitable conduct justifying subordination of Mrs. Estes' secured claim. This conclusion is difficult to accept considering the common place and legitimate nature of assignments by creditors of their secured interest to a co-debtor who has guaranteed the performance of the principal debtor. Georgia law recognizes that even in the absence of the assignment which was effected Mrs. Estes would be subrogated to the rights of FNBC. "A surety who has paid the debt of his principal should be subrogated, both at law and in equity, to all of the rights of the creditor and, in a controversy with other creditors shall rank in dignity to the same as a creditor whose claim he paid." O.C.G.A. § 10–7–56. Indeed, the Bankruptcy Code recognizes that "an entity that is liable with the debtor on, or that has secured, a claim of a creditor against the debtor, and that pays such claim, is subrogated to the rights of such creditor to the extent of such payment." 11 USC § 509(a).

Recognizing the legitimate right of Mrs. Estes to become subrogated to FNBC's secured position, the bankruptcy court nonetheless concluded that the assignment of FNBC's security interest was inequitable because "the creditors were not put on notice that there were two entities with a security interest in the debtor's inventory rather than just one." Record, at 57. The bankruptcy court also reasoned that had Mrs. Estes sought a security interest as a condition for her pledge, FNBC could not have taken a first security interest and probably would not have loaned the money which allowed the debtor corporation to continue its miserable business life to the detriment of general creditors. *Id.* The court rejects these conclusions of law as inaccurately reflecting the reality of the FNBC transaction. First, it is clear that there was only one security interest involved at all times and that general creditors could discover the existence and extent of the security interest by routine investigation of the filed financing statement and by further inquiry directed to FNBC. Such an investigation would also have revealed the position of Mrs. Estes as a guarantor of the debtor corporation's performance. In any event, upon succeeding to FNBC's secured position, Mrs. Estes was in no way suddenly revealing the existence of a secret, second security interest. The reality of the FNBC financing did not change in that there was still only one security interest which was openly represented by a publicly-recorded financing statement. The only inequity which can be said to result from Mrs. Estes' acquisition of a secured position is that she rather than FNBC became a secured party. Because she had a clear right under state law and the bankruptcy code to succeed to FNBC's position, no inequitable conduct can be discerned.

Mrs. Estes' position as a legitimate assignee and otherwise as a legal subrogee stands in stark contrast to those cases in which a secret lien on the assets of the debtor corporation actually exists. In *Nicholson v. Core (In Re Carolee's Combine, Inc.),* 3 B.R. 324 (Bankr.N.D.Ga.1980), claimant advanced "seed money" to persons organizing an auction in return for a "promissory note" which obligated the debtors to repay on the first day of the two-day auction the debt with interest prior to paying general creditors of the auction company. The bankruptcy court recognized that conduct of the claimant and similar investors,

> was clearly inequitable since the provisions of their contracts for prior payment injured three creditors and conferred an unconscionable advantage on them in exchange for which they were promised and received an extraordinarily high return. These investors advanced monies

to a speculative venture for the promise of a high return (certainly not in itself inequitable) but shifted the risk of that speculation to general creditors by arranging to be paid in advance. ... In essence, they secured a secret first claim on the assets of the corporation.

*Id.* at 328. The court consequently exercised its equity powers in subordinating the claim of this investor. Unlike the investor in the *In Re Carolee's Combine* case, Mrs. Estes never held a "secret lien," but only a legal right to be subordinated to a very public lien held by FNBC. The court cannot conclude that Mrs. Estes' conduct in acquiring FNBC's secured position was inequitable.

### (ii) *Undercapitalization and Other Inequitable Conduct*

The trustee urges the court to affirm the bankruptcy court's subordination of Mrs. Estes' claim but to do so on the basis of the "Deep Rock" doctrine. Arguing that Mrs. Estes loaned money to an already undercapitalized corporation and thereby breached her fiduciary duty toward the corporation, the trustee would have this court treat Mrs. Estes' claim as a capital contribution in reality.[4] Mrs. Estes denies that any of the instances of alleged inequitable conduct justify subordination. She argues in particular that subordination based upon the under-capitalization theory would be inappropriate in light of her position as a minority, non-dominating shareholder.

The grounds relied upon by the bankruptcy court, other than the assignment of the FNBC security interest, reveals that subordination in this case is appropriate only if the trustee is correct in his argument that Mrs. Estes breached her fiduciary duties by advancing funds to an undercapitalized corporation. The bankruptcy court emphasized the fact that Mrs. Estes

had or should have had knowledge of the pending insolvency of N & D Properties and that she was not justified in contributing to the insolvency by pledges and personal loans. This conduct, coupled with the swimming pool loan which Mrs. Estes repaid without interest, convinced the bankruptcy court that Mrs. Estes had failed to establish the good faith and inherent fairness of her transactions with the debtor corporation. Record at 58–59. Although the bankruptcy court did not rely upon the under-capitalization theory urged by the trustee, the facts upon which it relied in subordinating Mrs. Estes' claim would justify subordination only under such a theory. A review of the case law addressing the inequity inherent in conduct which is similar to the allegedly inequitable conduct of Mrs. Estes convinces this court that the bankruptcy court's conclusions of law regarding equitable subordination were in error. The allegedly inequitable conduct which formed the basis of the trustee's objections cannot as a matter of law be considered conduct justifying subordination.

Under the so-called "Deep Rock" doctrine urged in favor of affirmance by the trustee, shareholder loans to his corporation may be treated as capital contributions where there is "knowing undercapitalization and ... attendant unfairness to the creditors of the corporation." *In Re Mobile Steel Co.,* 563 F.2d at 702. Under-capitalization is consequently the basis for subordination primarily where the claimant advancing funds to the undercapitalized corporation is a director, controlling or dominating shareholder, or other insider. *Id;* see also *Mission Bay Campland v. Sumner Finance Corporation,* 731 F.2d 768, 771–72 (11th Cir.1984); *Machinery Rental, Inc. v. Herpel (In Re Multiponics, Inc.),* 622 F.2d 709, 713–22 (5th Cir.1980). In-

---

**4.** At first blush, it is difficult to understand what concern the trustee has with the labeling of Mrs. Estes' claim. Her claim has already been subordinated to those of all other claimants, a fate which could not be made worse by the mere labeling of her claim. However, it is apparent that the trustee is intent upon re-characterizing

Mrs. Estes' claim so that the transfer of funds from N & D Properties to Mrs. Estes will be considered fraudulent conveyances in the absence of antecedent debt based upon transactions which were previously labeled as *bona fide* loans. *See infra,* note 9.

deed, the Supreme Court has described subordination on the grounds of undercapitalization as follows:

> ... [s]o-called loans or advances by the *dominant or controlling stockholder* will be subordinated to claims of other creditors and thus treated in effect as capital contributions by the stockholder ... where the paid-in capital is purely nominal, the capital necessary for the scope and magnitude of the operations of the company being furnished by the stockholder as a loan.

*Pepper v. Litton,* 308 U.S. at 309–10, 60 S.Ct. at 246–47.

■■■ This circuit has recognized that the three-part test for the exercise of the power of equitable subordination set forth in the *In Re Mobile Steel Co.* case, discussed above, dictates that an insider not be held to have breached his fiduciary duties merely because of having loaned money to an undercapitalized corporation. Rather, additional circumstances must exist which indicate that, in addition to undercapitalization, the insider engaged in inequitable conduct which would justify subordination. *Mission Bay Campland,* 731 F.2d at 772. The court in *Mission Bay Campland,* rejected an appellant's argument that its loans to a corporation it controlled had been subordinated merely because of undercapitalization. The court concluded:

> The special master did not invalidate the $1 million conveyance from [appellant] to [debtor] solely because [debtor] was undercapitalized. Rather, the special master articulated various attendant circumstances which indicated that, *in addition to undercapitalization, [appellant] engaged in "inequitable" or "fraudulent" conduct which would justify subordination....* These findings are supported by the evidence.

731 F.2d at 772 (emphasis added). Although the court did not identify this conduct, the necessity of such attendant misconduct is inescapable. Otherwise, the spectre of subordination would have a chilling effect on corporate investment and re-

quire all contributions to be made in the form of equity capital. *Sinclair v. Barr (In Re Mid-Town Produce Terminal, Inc.),* 599 F.2d 389, 392 (10th Cir.1979); *Peck v. Pancho's International, Inc. (In Re Pancho's International, Inc.),* 26 B.R. 5, 9 (Bankr.M.D.Fla.1982). "Any other [analysis] would discourage loans from insiders to companies facing financial difficulty and that would be unfortunate because it is the shareholders who are most likely to have the motivation to salvage a foundering company." *Rego Crescent Corp. v. Tymon (In Re Rego Crescent Corp.),* 23 B.R. 958, 964 (Bankr.E.D.N.Y.1982). Therefore, it is only when undercapitalization is combined with inequitable conduct, such as fraud, spoilation, mismanagement or faithless stewardship, that the claims of dominant or controlling shareholders and other insiders will be subordinated. *See generally* Herzog and Zweibel, *The Equitable Subordination of Claims in Bankruptcy,* 15 Vand.L.Rev. 83, 112 (1961).

This interpretation is consistent with the original "Deep Rock" case, where the Supreme Court subordinated the claims of a controlling shareholder because the shareholder through complete domination and control of the debtor corporation purposefully created enormous indebtedness in lieu of sufficient capitalization, and because the shareholder engaged in other inequitable conduct. *See Taylor v. Standard Gas Co.,* 306 U.S. 307, 318–24, 59 S.Ct. 543, 548–50, 83 L.Ed. 669 (1939). For example, the controlling shareholder, Standard Gas Company, caused the debtor corporation, Deep Rock Oil and Refining Company, to pay exorbitant sums for management and supervision of Deep Rock's affairs and to pay unwarranted dividends. All of the circumstances convinced the Court that Standard's inequitable conduct justified subordination of its claims and treatment of them as if they were capital contributions.

The case of *In Re Multiponics, Inc.,* 622 F.2d 709 (5th Cir.1980), relied upon by both parties in their arguments, illustrates an appropriate application of the Deep Rock doctrine. The court in *Multiponics* con-

sidered the appeal of an order subordinating the claim of a director of the debtor corporation. The director, Carl Biehl, was a substantial shareholder and founder of the debtor corporation. The court considered the application of the "Deep Rock" doctrine and stated that the requisite undercapitalization would be deemed to exist if a reasonably prudent man with general business background would deem the company undercapitalized. In particular, the court explained,

> (1) Capitalization is inadequate if, in the opinion of a skilled financial analyst, it would definitely be insufficient to support a business of the size and nature of the bankrupt in light of the circumstances existing at the time the bankrupt was capitalized;
>
> (2) Capitalization is inadequate if, at the time the advances were made, the bankrupt could not have borrowed a similar amount of money from an informed outside source.

*Id.* at 717 (citing *In Re Mobile Steel Co.,* 563 F.2d at 703). Based on the facts of the case the court concluded that Multiponics was not only seriously under-financed from its inception, but also benefited from advances made possible by Biehl and other directors when it could not have acquired financing from outside sources. *Id.* at 718-20. The court also concluded that Biehl knew of the financial condition of the corporation, particularly its undercapitalization and attendant burden of debt. *Id.* at 719-20.

The court did not rest subordination merely upon Biehl's advances of funds to an already undercapitalized corporation. Other instances of inequitable conduct justified the conclusion that Biehl had breached his fiduciary duties toward the corporation. For example, Biehl voted, along with his fellow board members, to purchase all the stock of Lisbon Development Corporation, a corporation wholly owned by a fellow board member. Lisbon was indebted to its sole owner in the amount of $300,000. Despite this debt and other substantial liabilities of Lisbon, and despite the fact that Multiponics was unable to purchase Lisbon outright because of being undercapitalized itself, Biehl participated in the acquisition of Lisbon by personally guaranteeing the loan which made the Lisbon purchase possible. The court also recognized evidence that if Multiponics had not acquired Lisbon, Biehl would have been obligated to purchase personally a fifteen percent interest in Lisbon. These circumstances justified the court's conclusion that Biehl and his fellow directors "engaged in an 'overall pattern of self-interest' and that the Lisbon capitalization device operated to the 'detriment of the company's financial structure.'" *Id.* at 715. Other instances of Biehl's misconduct included his participation in votes approving the repurchase of shares in violation of a debenture agreement. *Id.* at 716.

All of these actions by Biehl convinced the court that he had failed to deal fairly and in good faith with the debtor corporation and its creditors. The court concluded that:

> Biehl knew or should have known of the serious financial straits of the Company. Biehl had a Master's Degree in Business Administration from Harvard University and was, along with other directors, an experienced businessman. He was always provided with the current internal financial information and outside auditor's financial statements. At all relevant times, Biehl was the director of the Company, a substantial shareholder, as well as one of the founders. Biehl voted for, approved of, or failed to object to all of the above transactions. .... Biehl's input—or repeated lack of input—regarding the financial foundation of the Company did not constitute merely errors of judgment, but, rather, improvident and unacceptable conduct of a fiduciary.

*Id.* at 720.

■ Even if this court were to find the necessary undercapitalization based on the facts as recited, Mrs. Estes' position and conduct stands in stark contrast with the circumstances such as those described in the *Multiponics* case. She was not an

insider whose conduct in contributing to the undercapitalization of the debtor corporation can be considered inequitable. An "insider" is defined by the Bankruptcy Code as including a "(i) director of the debtor; (ii) officer of the debtor; (iii) person who controlled the debtor; (iv) partnership in which the debtor is the general partner; (v) general partner of the debtor; or (vi) relative of a general partner, director, officer, or person in control of the debtor...." 11 USC § 101(28)(B). The only insider role which Mrs. Estes could possibly have played was that of a person in control of the debtor corporation. She did not have control by virtue of her forty-five percent interest in the corporation.[5] If she was not a controlling shareholder, then her control of the debtor corporation could only have consisted in her exercise of actual control and direction over corporate management. *See Lewis v. Knutson,* 699 F.2d 230, 235 (5th Cir.1983). While Mrs. Estes no doubt held the "purse-strings" of N & D Properties, Inc., the bankruptcy court's findings of fact indicate that she remained aloof from the control and direction over corporate management. She merely responded to a good friend's entreaty that his business would succeed and flourish if only she would lend him a helping hand in the form of pledges and guarantees. There is no evidence in the record that Mrs. Estes ever suggested the method of capitalizing or financing the debtor corporation or that she was actually aware of its capitalization and finances.

The bankruptcy court apparently was in agreement with this assessment of Mrs. Estes' position. While the court termed her an insider in the reconsideration opinion for the purposes of bolstering its conclusion that she had not established the good faith and inherent fairness of her transactions with the corporation, Record at 59, the bankruptcy court was earlier quite adamant in its characterization of her as a non-insider until the days prior to the filing of the bankruptcy petition. Record

at 45–46. In any event, this court's independent analysis convinces it that any characterization by the bankruptcy court of Mrs. Estes as an insider must have been in error.

Because Mrs. Estes cannot be considered an insider who knowingly undercapitalized the debtor corporation, any fiduciary responsibility which would give rise to a duty for her to capitalize the corporation adequately must be found in her position as a minority shareholder. It is generally agreed that a shareholder who does not exercise control over a corporation has "no duty to inquire into the operation of the corporation's business and [is] not chargeable with knowledge of the dealings and other transactions of the corporation." *Fletcher Cyclopedia Corporations* Section 5713 (1984). Courts of the state under which N & D was formed, Georgia, have recognized this proposition. In determining whether minority shareholders who had succeeded in enjoining the corporation from performing *ultra vires* acts were entitled to attorney's fees, the Georgia Supreme Court was forced to address the question of whether the minority shareholders were acting as trustees of the corporation. *Alexander v. Atlanta and West Point R.,* 113 Ga. 193, 38 S.E. 772 (1901). The court observed,

> We do not question the proposition that a trustee is entitled to a reimbursement out of the trust fund for all expenses properly incurred in preserving or protecting that fund. But we are unable to understand how these plaintiffs can, in any sense, be regarded as trustees. They were simply stockholders in a corporation.... Being a minority, they could not control, and therefore would not be responsible for, the management of the affairs of the corporation.

*Id.* 113 Ga. at 195–96, 38 S.E. 772. As a minority shareholder, Mrs. Estes had no duty to inquire into the financial state of the debtor corporation before agreeing to

---

**5.** James Dowis held the controlling 500 shares of N & D Properties, Inc. Tr. V. IV, p. 70

(Dowis).

pledge or guarantee loans accruing to the corporation's benefit. She did not know and had no duty to know facts essential to an understanding of the financial status of the debtor corporation.[6]

Even if this court were to conclude that Mrs. Estes' position as a minority shareholder and her relationship with Mr. Dowis justified imposition of fiduciary duties upon her, there is no evidence of other inequitable conduct which would justify subordination. *Mission Bay Campland,* 731 F.2d at 772. No attendant inequitable conduct by Mrs. Estes exists in this case. The only hint of self-dealing was the pool loan which she repaid in full. The non-payment of interest on this loan may be considered unfair until one recognizes that such non-payment was very likely part and parcel of the debtor corporation's consideration for Mrs. Estes' original pledges of her bonds. There are no other instances of self-dealing or of participation in schemes which redounded to the detriment of the debtor corporation's creditors.[7]

Mrs. Estes' position and conduct in light of the controlling law is not the only factor which convinces this court that equitable subordination of her claim would be inappropriate. Such a holding would only serve to punish those who are not informed lenders to corporations run by friends and family. For all the foregoing reasons, the court cannot conclude that Mrs. Estes engaged in the type of inequitable conduct which would justify subordination. Because the court concludes that Mrs. Estes did not engage in inequitable conduct, consideration of the second two prongs of the

three-part test for subordination set forth in *In Re Multiponics, Inc.,* 622 F.2d at 713, is unnecessary.[8]

C. *Liability for Fraudulent Conveyances and Preferential Transfers.*

The trustee urges that the bankruptcy court was in error in not finding Mrs. Estes liable for fraudulent conveyances under Georgia law and under the bankruptcy code. Georgia law proscribes the following conveyances by a debtor as fraudulent:

(1) Every assignment or transfer by a debtor, insolvent at the time, of real or personal property or choses in action of any description to any person, either in trust or for the benefit of or on behalf of creditors, where any trust or benefit is reserved to the assignor or any person for him;

(2) Every conveyance of real of personal estate, by writing or otherwise, and every bond, suit, judgment and execution, or contract of any description had or made with intention to delay or defraud creditors, where such intention is known to the taking party; a *bona fide* transaction on a valuable consideration, where the taking party is without notice or ground for reasonable suspicion of said intent of a debtor, shall be valid; and

(3) Every voluntary deed or conveyance, not for a valuable consideration, made by a debtor who is insolvent at the time of the conveyance.

O.C.G.A. § 18–2–22 (Supp.1985). The Bankruptcy Code also proscribes conveyances made within one year before the date

---

**6.** The bankruptcy court made much of the fact that Mrs. Estes knew of the FNBG default and should have known of losses suffered by the corporation which accrued to her benefit as a taxpayer. The FNBG default may have served as a warning, but it was not a definitive sign of insolvency. Likewise, tax losses routinely taken by those with an interest in businesses cannot be considered an indication to the taxpayer that the business has gone under.

**7.** The bankruptcy court also relied upon misrepresentations in financial statements of the debtor corporation as to the ownership of the American Brands stock. However, the court never found that Mrs. Estes ever saw such financial

statements, and the record reveals she did not participate in this misrepresentation or receive such financial statements. Tr. V. II, p. 5 (Estes); Tr. V. IV, p. 62, 107–08 (Dowis).

**8.** By holding that the bankruptcy court's subordination of Mrs. Estes' claim was in error, this court is necessarily concluding that either the trustee failed to discharge his burden of coming forward with substantially supported and legally sufficient grounds for subordination, or that Mrs. Estes has proven the inherent fairness of the challenged transactions. *See In Re Mobile Steel Co.,* 563 F.2d at 701.

of filing of the petition to the extent that the debtor,

(1) Made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or

(2)(A) Received less than a reasonably equivalent value in exchange for such transfer or obligation; and (B)(i) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation; (ii) was engaged in business or transaction, was about to engage in business or transaction, for which any property remaining with the debtor was an unreasonably small capital; or (iii) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

11 USC § 548(a).

None of the conveyances from N & D Properties, Inc. to Mrs. Estes may be avoided on the basis of the foregoing statutory provisions. First, there is no evidence and the trustee does not urge that any assignment or transfer by the debtor was made in trust or for the benefit of or on behalf of the creditors within the meaning of O.C.G.A. § 18–2–22(1). Nor is there any evidence of any conveyances which were made with the intention to delay or defraud creditors where such intention was known to Mrs. Estes. *See* O.C.G.A. § 18–2–22(2); 11 USC § 548(a)(1). Therefore, the only facts which can justify avoidance on the basis of a fraudulent conveyance under either state or federal law would be the existence of conveyances made for less than valuable consideration while the debtor corporation was insolvent or operating on an unreasonably small amount of capital. *See* O.C.G.A. § 18–2–22(3); 11 USC § 548(a)(2).

■ The trustee urges that payments to Mrs. Estes by N & D Properties ostensibly for interest should be avoided as fraudulent conveyances. This court agrees with the bankruptcy court that interest payments Mrs. Estes received were in return for the valuable consideration of a *bona fide* antecedent debt of the debtor corporation. Consequently, the court cannot conclude that these interest payments were fraudulent conveyances. *See* O.C.G.A. § 18–2–22(3); 11 USC § 548(d)(2).[9]

■ In addition to the interest payments made to Mrs. Estes, the trustee argues that transfers of property to Teaselwood Farms was a fraudulent conveyance made for the benefit of Mrs. Estes. After reviewing the record, the court cannot conclude that the bankruptcy court was incorrect when it concluded that the "trustee did not introduce sufficient evidence to persuade this Court that plaintiff is liable either for money Dowis or the corporate debtor transferred directly or indirectly to such entities as Teaselwood Farms...." Record at 43–44. Although Mrs. Estes was

---

9. The trustee has also urged this court to characterize transfers of property to Mrs. Estes as fraudulent conveyances based upon a determination that her alleged loans which are the basis for her claim were actually capital contributions. While the court has declined to characterize her claim as a capital contribution, such characterization would not in any way result in a finding of fraudulent conveyances. In the first place, the only conveyance which could possibly be affected by such a characterization would be the transfer of the $79,692.61 in excess from the liquidation of Mrs. Estes' American Brands stock by FNBC. This is the only transfer of property related to the claim of Mrs. Estes which the trustee would characterize as a capital contribution. The characterization of the FNBC loan as a capital contribution would not result in a determination that the transfer of the excess from the stock liquidation is a fraudulent conveyance. This excess represented the liquidation of Mrs. Estes' property and not the property of the debtor corporation. It is difficult to perceive what effect the characterization of the FNBC debt as a capital contribution would have on the transfer of these excess monies unless one concluded that Mrs. Estes had actually contributed all of the stock which she hypothecated to the debtor corporation as paid-in capital. The bankruptcy court forcefully and convincingly rejected this conclusion, and the trustee has not disputed the bankruptcy court's conclusion. See Record, 34–39.

listed as a proprietor of Teaselwood Farms on her tax returns for 1980 to 1982, the testimony of Dowis makes clear that these tax returns were inaccurate. James Dowis owned Teaselwood Farms but as Mrs. Estes' accountant he acted as a self-appointed agent of Mrs. Estes for the purpose of giving her the benefit of losses realized in the operation of Teaselwood Farms. Tr.V. IV, pp. 99–109 (Dowis). There is no evidence that Mrs. Estes had any involvement in or knowledge of the farming operation or of any withdrawals from N & D Properties for the benefit of Teaselwood Farms. *Id.* at 99–100; *see also* Tr.V. II, pp. 7–9, 34–36.

■ In addition to arguing that Mrs. Estes is liable for fraudulent conveyances, the trustee urges that preferential transfers accrued to the benefit of Mrs. Estes. Under the Bankruptcy Code the trustee may avoid any transfer of an interest to the debtor in property:

(1) To or for the benefit of a creditor;

(2) For or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) Made while the debtor was insolvent;

(4) Made—(A) on or within ninety days before the date of the filing of the petition; or (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider;

(5) That enabled such creditor to receive more than such creditor would receive if—(A) the case were a case under chapter 7 of this title; (B) the transfer had not been made; and (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 USC § 547(b). The only transfer of debtor's property which occurred within ninety days of the filing of the bankruptcy petition was the creation of a security interest in property of the debtor in return for a $1200 loan from Mrs. Estes to be used for filing the bankruptcy petition. As the bankruptcy court noted, this transfer of interest in the debtor corporation's prop-

erty was a contemporaneous exchange for new value given to the debtor and not a transfer based upon an antecedent debt. Consequently, the trustee may not avoid transfer of the security interest in return for the $1200 loan. *See* 11 USC § 547(c).

■ Although interest payments were made to Mrs. Estes by N & D Properties between ninety days and one year before the date of filing of the petition, the court has already determined that Mrs. Estes was not an insider within the meaning of the bankruptcy code at the time of such transfers. *See* discussion, *supra,* and citing 11 USC § 101(28)(B). Consequently, such transfers cannot be avoided. 11 USC § 547(b)(4)(B).

## IV. CONCLUSION.

In sum, the decision of the bankruptcy court is AFFIRMED IN PART and REVERSED IN PART. Mrs. Estes has a secured claim against the estate of the debtor corporation in the amount of $132,858.61. The claimant is not liable to the trustee for any fraudulent conveyances or preferential transfers.