**HECHINGER LIQ. TRUST, not individually, but solely as indenture trustee aka HSBC Bank USA, Plaintiff,**

v.

**BANKBOSTON RETAIL FINANCE, INC., individually and as agent for lenders under Credit Agreement dated as of September 26, 1991, Credit Agreement dated as of December 31, 1998 and Amended and Restated Credit Agreement dated March 18, 1999, Defendant.**

No. CIV.A.00–973–SLR.

United States District Court,
D. Delaware.

Dec. 10, 2002.

---

Mark Minuti and Tara L. Lattomus of Saul Ewing LLP, Wilmington, Delaware, Counsel for Plaintiff, Of Counsel: David M. Friedman, Richard F. Casher, Andrew K. Glenn of Kasowitz, Benson, Torres & Friedman LLP, New York City.

Richard S. Cobb of Klett, Rooney, Lieber & Schorling, P.C., Wilmington, Delaware, Counsel for Defendant, Of Counsel: Paul S. Samson, Jeffery D. Ganz of Riemer & Braunstein, LLP, of Boston, Massachusetts.

## MEMORANDUM OPINION

SUE L. ROBINSON, Chief Judge.

## I. INTRODUCTION

This case is an adversary proceeding initiated in connection with the bankruptcy petition filed by Centers Holdings, Inc.

and its subsidiaries under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware. The order of reference has been withdrawn and the case is pending before this court. (D.I.1) The court has jurisdiction over this action pursuant to 28 U.S.C. § 1334.

Currently before the court are a motion for partial summary judgment filed by the plaintiff, the Hechinger Liquidation Trust ("the Trust"), and a motion for summary judgment filed by the defendant, BankBoston Retail Finance, Inc. ("BankBoston").[1] (D.I. 27, 19) The plaintiff, acting as Indenture Trustee, is seeking an equitable lien against BankBoston and equitable subordination of BankBoston's claims to the claims of the Trust. On October 31, 2002 this court ordered defendant to re-submit certain illegible exhibits. Having received and reviewed these exhibits, the court denies both parties' motions for summary judgment.

## II. BACKGROUND

This case involves a complex series of transactions resulting in the merger of two do-it-yourself home improvement retail store chains, the Hechinger Company chain of home improvement stores ("Hechinger's") and the Builders Square, Inc. chain of home improvement stores ("Builders Square"). The transactions at issue occurred in September 1997.

1. Also before the court are motions by Bank-Boston to strike portions of the declaration of Conrad F. Hocking and to strike portions of the supplemental declaration of Conrad F. Hocking. (D.I.34, 47) These motions are denied as moot.

2. In 1999, HSBC Bank U.S.A. became the Indenture Trustee.

3. The purchase money exception to the Negative Pledge clause exempts

Prior to the merger, Hechinger's entered into an indenture ("the Indenture") with First Union National Bank of North Carolina as Indenture Trustee.[2] (D.I.30, Ex. 1) Pursuant to the Indenture, Hechinger's issued $100 million of senior unsecured debentures in November 1992 and an additional $100 million of senior unsecured debentures in October 1993 ("the Notes"). (*Id.*, Exs. 2, 3) The Indenture included a Negative Pledge clause stating, in part, that

> the Issuer will not, and will not permit any Restricted Subsidiary to, create, assume, incur any Indebtedness secured by a Lien on any Operating Property or Operating Asset of the Issuer or any Restricted Subsidiary, whether such Operating Property or Operating Asset is now or hereafter acquired[.]

(*Id.*, Ex. 1 at § 3.6) Thus, the Negative Pledge clause restricted Hechinger's and its subsidiaries from issuing any additional secured debt on certain operating assets and property whether currently owned or later purchased.

The Indenture required that if any indebtedness issued in violation of the Negative Pledge, Hechinger's must "effectively provide[ ] concurrently with the issuance, assumption or guarantee of any such Indebtedness that the [Notes] be secured equally and ratably with such Indebtedness." (*Id.*) The Indenture allowed for two exceptions to the Negative Pledge clause: (1) a purchase money exception;[3]

> [l]iens to secure the payment of all or any part of the purchase price or construction costs in respect of Operating Property or Operating Assets acquired by the Issuer or a Restricted Subsidiary after the date hereof securing Indebtedness, incurred prior to, at the time of, or within 18 months after, the opening for business of any such Operating Property or the acquisition of such Operating Assets, in the aggregate not in excess of the amount expended in the acquisition of such property or properties plus

and (2) a refinancing exception.[4] (*Id.,* Ex. 1 at §§ 3.6(c) and (h)) The purchase money exception allowed Hechinger's to purchase new assets with additional indebtedness provided that only the new assets were offered as collateral. The refinancing exception allowed Hechinger's to refinance an existing loan without violating the Negative Pledge.

The transactions at issue were facilitated by Leonard Green & Partners L.P. ("Leonard Green"), an investment banking firm. (D.I. 25, Ex. B at 15) In preparation for the September 1997 transactions, a group of investors affiliated with Leonard Green formed Center Holdings, Inc., which created BSQ Acquisition, Inc. ("BSQ Acquisition") as a subsidiary. In addition, Builders Square, a subsidiary of the Kmart Corporation, Inc., formed BSQ Transferee Corp. ("BSQ Transferee").

On September 25, 1997, Builders Square transferred certain operating assets and liabilities to BSQ Transferee. (D.I. 30, Ex. 5 at § 1.4) BSQ Acquisition purchased the stock of BSQ Transferee from Builders Square for $10 million in cash, plus a warrant to purchase shares of stock in Center Holdings, Inc. (*Id.,* Ex. 5 at § 1.7) Thus, BSQ Transferee became a subsidiary of BSQ Acquisition. Centers Holdings, Inc. and BSQ Acquisition would ultimately be parent corporations of the corporate entity operating the Hechinger's–Builders Square home improvement chain.

BSQ Transferee then obtained a $171 million interim loan from the Chase Bank Group ("Chase"). (*Id.,* Ex. 7) The loan was secured by the inventory, accounts receivable and equipment of BSQ Transferee. (*Id.,* Ex. 7 at Ex. H) BSQ Transferee loaned $110 million to BSQ Acquisition. (*Id.,* Ex. 8 at 5) BSQ Acquisition used the loan to purchase all of the Hechinger Company stock from the shareholders, making Hechinger Company a subsidiary of BSQ Acquisition. (*Id.*) Chase also loaned the Hechinger Stores Company (a subsidiary of Hechinger Company) $112 million to refinance an existing loan from CIT Credit Corporation.[5] (D.I. 21, Ex. 3 at 174; D.I. 30, Ex. 8 at 6)

On September 26, 1997, Hechinger Investment Company of Delaware ("HICD"), a subsidiary of Hechinger Company, entered into a permanent loan agreement with Chase. (D.I.31, Ex. 20) The loan agreement provided for a maximum availability of $600 million with an initial advance of $243 million. (*Id.*) HICD used the $243 million to purchase from BSQ Transferee certain operating assets and liabilities originally purchased by BSQ Transferee from Builders Square. (D.I.30, Ex. 9) BSQ Transferee then used part of the $243 million payment to repay the $171 million interim loan from Chase. (*Id.,* Ex. 8 at 9) The Hechinger Stores Company repaid the $112 million loan to Chase using, in part, the funds remaining from the initial $243 million advance to HICD. (*Id.,* Ex. 8 at 9–10)

the aggregate amount expended for improvements thereon[.]
(D.I. 30, Ex. 1 at § 3.6(c))

4. The refinancing exception to the Negative Pledge clause exempts
the extension, renewal or replacement of any Lien permitted by subparagraph (b), (c), (d), (e), (f), (g) or (n), but only if the principal amount of Indebtedness secured by the Lien immediately prior thereto is not

increased and the Lien is not extended to other property[.]
(*Id.,* Ex. 1 at § 3.6(h))

5. The loan amount refinanced is disputed. Plaintiff claims the refinanced loan amount is $89,599,034.08 (D.I. 46 at ¶ 16), while defendant's briefs assert the amount is $112 million.

On September 29, 1997 the Hechinger Stores Company and the Hechinger Stores East Coast Company transferred operating assets to HICD. (D.I.23, Exs.137, 138) Thus, the merger of the Hechinger's chain and the Builders Square chain was completed, operating under HICD.

In March 1999, BankBoston (now Fleet Retail Financing) refinanced the existing Chase permanent loan with HICD. (D.I. 30, Ex. 14; D.I. 31, Exs. 15, 21, 22) In June 1999, Hechinger's and its various affiliates filed for protection under Chapter 11 of the Bankruptcy Code. On July 20, 1999, the bankruptcy court entered the final order authorizing post-petition secured super-priority financing. Pursuant to the bankruptcy proceedings, BankBoston's loans have been repaid in full from the liquidation of various Hechinger's assets. (D.I. 29 at ¶ 7) The unsecured creditors, including the Noteholders pursuant to the Indenture, have not received any recovery as of February 20, 2002. (*Id.*) HSBC Bank U.S.A., as legal representative of the Noteholders, commenced this adversary proceeding against BankBoston on May 26, 2000, seeking an equitable lien against BankBoston for violation of the Indenture as well as equitable subordination of BankBoston's claims to the claims of the Noteholders.[6] (D.I.2)

## III. STANDARD OF REVIEW

A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n. 10, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Fed. Kemper Life Assurance Co.*, 57 F.3d 300, 302 n. 1 (3d Cir.1995) (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348 (quoting Fed.R.Civ.P. 56(e)). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pa. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir.1995). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

## IV. DISCUSSION

■ Plaintiff asserts that the value of the Builders Square assets is determined

---

**6.** This suit was originally filed by the Indenture Trustee, HSBC Bank U.S.A. As a result of the bankruptcy, HSBC Bank U.S.A. has been replaced as plaintiff by The Liquidation Trust of Hechinger Investment Company of Delaware, Inc. formed under the bankruptcy plan. (D.I.51)

by the arm's length transaction between BSQ Transferee and BSQ Acquisition. According to plaintiff, the acquired assets have a value of $10 million, not $171 million or $243 million; therefore, the permanent loan violates the Negative Pledge clause to the extent the loan was in excess of the value of the assets acquired and the value of the CIT Credit Corporation loan that was refinanced. Defendant asserts that the structure of the transaction must be honored and that the actual value of the assets acquired was at least $600 million. According to defendant, the Negative Pledge clause was not violated because the transaction is within the purchase money and refinancing exceptions.

The court's analysis begins with a determination of whether the Negative Pledge clause has been breached. Absent a breach of the Negative Pledge clause, no basis exists to grant plaintiff the equitable remedies requested.

The purchase money exception to the Negative Pledge clause forecloses a finding that the Indenture was breached if the additional financing was employed to "secure the payment of all or any part of the purchase price ... of Operating Property or Operating Assets[.]" (D.I. 30, Ex. 1 at § 3.6(c)) As plaintiff states in its opening brief: "The rationale for this exception is not difficult to discern: if Hechinger incurred secured debt to obtain additional assets, the Noteholders would not be harmed. The increase in secured debt would be offset by a correlating increase in Hechinger's assets." (D.I. 28 at 7–8) The

court agrees with plaintiff's characterization of the purchase money exception.

■  Plaintiff has requested equitable remedies in the form of an equitable lien and equitable subordination of defendant's claim. "[I]n the exercise of its equitable jurisdiction the bankruptcy court has the power to sift [through] the circumstances surrounding any claim to see that injustice or unfairness is not done in administration of the bankrupt estate." *Pepper v. Litton,* 308 U.S. 295, 307–08, 60 S.Ct. 238, 84 L.Ed. 281 (1939) (citing *National Cash Register Co. v. Dallen,* 76 F.2d 867 (3rd Cir.1935)). Plaintiff concedes that the Noteholders would not be harmed if the increase in secured debt is offset by an increase in assets. Thus, looking to the substance of the transaction, the court must determine if the increase in secured debt was offset by a correlating increase in assets; if so, no injustice or unfairness has occurred.

In the case at bar, HICD financed the purchase of the BSQ Transferee assets and refinanced existing CIT Credit Corporation loan with the $243 million permanent loan.[7] Subtracting the refinancing portion of the permanent loan,[8] the purchase money exception is required to cover approximately $153 million of the permanent loan. If the purchase money exception does not cover at least $153 million, the Negative Pledge clause has been breached, in substance as well as in form. Thus, at least initially, the dispositive issue in the case at bar is: What is the value of the assets and liabilities received by HICD through the transactions at issue?

7.  Plaintiff concedes that the refinancing exception to the Negative Pledge clause applies to a portion of the $243 million permanent loan. (D.I. 44 at 13)

8.  Plaintiff and defendant disagree as to the amount applicable to the refinancing exception. Plaintiff argues the refinancing excep-

tion applies to $89,599,034.08 (the remaining principal balance on the CIT Credit Corporation loan); defendant argues the refinancing exception applies to $112 million. The difference is not relevant to the court's decision. For purposes of this motion, however, the court will assume plaintiff is correct.

Although plaintiff accurately states the rationale of the purchase money exception relating to the value of the assets and liabilities received by Hechinger's and HICD, plaintiff argues that the value of the inventory received is irrelevant. Subsequent to this court's order, plaintiff filed a letter brief urging this court to focus on the Negative Pledge clause language "that such liens may not in the aggregate [exceed] the **amount expended** in the acquisition of such property[.]" (D.I. 56 at 1) (emphasis in original) According to plaintiff, the amount expended was $10 million.

■ In arguing that this court should "collapse" the transactions, plaintiff urged the court "not [to] employ a mechanical and formalistic interpretation of the Negative Pledge as applied to the Transaction. Instead, in considering whether a lien should be imposed under equitable principles, the court should examine the Transaction as a whole to determine whether the Negative Pledge was breached." (D.I. 28 at 25) The court agrees with plaintiff's contention that the court should not employ a mechanical and formalistic interpretation of the Negative Pledge clause.[9] As a court of equity, this court is charged with ensuring "that substance will not give way to form, that technical considerations will not prevent substantial justice from being done." *Pepper,* 308 U.S. at 305, 60 S.Ct. 238; *accord Chase Manhattan Bank v. Brown & East Ridge Partners,* 243 A.D.2d 81, 672 N.Y.S.2d 206, 208 (N.Y.App.Div. 1998) ("[A] court of equity looks to the substance of the action, not its form[.]") (internal citations omitted).

■ Because the case at bar does not involve the parties to the Indenture, it does not require a strict contractual interpretation by a court at law. *See National Cash Register,* 76 F.2d at 868 ("We do not think it necessary to determine whether the contract for the purchase of the new cash register amounted to a bailment lease or a conditional sale. Bankruptcy courts may apply rules regulating equitable actions.") (internal citation omitted). Plaintiff has requested equitable remedies. "The essence of a court's equity power lies in its inherent capacity to adjust remedies in a feasible and practical way to eliminate the conditions or redress the injuries caused by unlawful action. Equitable remedies must be flexible if these underlying principles are to be enforced with fairness and precision." *Freeman v. Pitts,* 503 U.S. 467, 487, 112 S.Ct. 1430, 118 L.Ed.2d 108 (1992). If the purpose of the purchase money exception was not violated, no injury or harm has occurred for the court to redress. Thus, if the value of the assets and liabilities acquired by HICD exceeded the amount of secured debt, no equitable remedies should be imposed. If, on the other hand, the value of the assets and liabilities acquired by HICD are less than the amount of secured debt, equitable remedies may be appropriate.

Plaintiff fails to provide any evidence that $10 million is the actual value of the assets despite its disputation over defendant's valuation. Defendant has attempted to provide evidence that the value of the assets and liabilities received was actually in excess of the $153 million necessary under the purchase money exception, but has conceded that "[i]f the Trust is disputing the valuation by Kmart ... this is a matter which would require expert testimony." (D.I. 35 at 12 n. 10) Thus, the court finds that neither party has satisfied its burden of proof regarding the valuation

---

**9.** The court notes that plaintiff has asked the court to ignore the form of the Negative Pledge clause for one purpose and to mechanically apply the Negative Pledge clause for another. The court declines to embrace plaintiff's inconsistent position.

of the assets and liabilities acquired through the transactions at issue. Both parties' motions for summary judgment are denied.

## V. CONCLUSION

For the reasons stated, the court shall deny plaintiff's motion for partial summary judgment and deny defendant's motion for summary judgment. An appropriate order shall issue.